THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. REGINALD V. PERRY, Defendant-Appellant.

First District (6th Division)   No. 1—87—0463

Opinion filed February 28, 1992.

Jeffrey A. Kripton, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Andrea Bonin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Reginald Perry was found guilty in a bench trial of armed robbery and murder and sentenced to consecutive terms of 50 years for the murder and 30 years for the armed robbery. On appeal, defendant raises as issues: (1) whether the prosecutor's failure to tender grand jury transcripts of witnesses against defendant in response to discovery requests prior to trial deprived defendant of a fair trial; (2) whether defendant was proven guilty beyond a reasonable doubt of the crimes charged; and (3) whether the imposition of consecutive sentences was excessive under the facts and circumstances of this case.

Defendant was indicted October 12, 1985, on four counts of murder and one count each of armed violence, robbery and armed robbery. The trial judge granted pretrial discovery motions filed by defendant and the State. The defendant's motion included a request for disclosure of the names of any State witnesses and production of previous written or recorded statements by the witnesses. Before trial defendant filed a motion to dismiss alleging that he was promised immunity from prosecution on these charges because he had testified for the State against defendant in another case. The motion was denied.

A bench trial commenced October 21, 1986, and was heard on six nonconsecutive dates. The final days of trial were December 17 and December 30, 1986.

Natalie Leon Lasko, older sister to the victim, Ivan Leon, testified that her brother came from Colombia to Chicago to live with her on October 14, 1984. She testified that her brother later moved to an apartment at 5400 N. Sheridan in Chicago and took a night janitor's job at the Sears Tower. She testified that in the early morning hours of August 8, 1985, she received a call from her doorman, who told her the police needed to speak with her at a nearby building. She spoke to police there and told them her brother also used the name of Julian Ciera. She testified that she went to the hospital where her brother had been taken and learned that her brother had died.

She testified on cross-examination that her brother was an accountant in Colombia and that the two were working to get his papers in order so he could stay in the United States permanently. She testified that the reason she told police her brother was feeling depressed was because he was homesick. She denied telling a police detective that her brother had threatened or attempted suicide.

Kathleen Frazier, who lived on the sixth floor of an apartment building on Sheridan Road in Chicago, testified that she heard someone shout two times, "Give me your wallet," at approximately 2 a.m. on August 8, 1985. She testified that she went to the window and looked down to the intersection of Sheridan and Balmoral in Chicago. A tree partially obstructed her view but she testified she could see shadows, "as if there was a fracas going on." She testified that she saw the victim fall to the ground, face up, and saw that his shirt was covered with blood. She testified that she saw the back of someone as he ran down Balmoral. She testified that the man running was a lighter hue black man or perhaps a lighter hue Hispanic man. He wore dark colored pants and no shirt. She testified that he was a younger man with a slim, muscular build and dark hair cut close to his head. She testified that she phoned 911.

On cross-examination she testified that she was having trouble sleeping and therefore was awake when she heard someone shout. She testified that she could not see what occurred on the ground below because a tree blocked her view. She stated that she could see the victim's upper torso when he fell to the ground. She did not see the person on Balmoral running away from the victim, she just saw him on Balmoral, running. She could not identify defendant as the assailant.

Allen Lucas, a Chicago police officer, testified that he found the victim at the scene with several stab wounds to his chest and his pockets turned inside out. He inventoried several items found at the scene including men's glasses, a pen, a comb case and a man's wallet found near a mailbox. He testified that he interviewed Frazier, who told him that she was awakened by a man yelling "Give me your wallet. Hurry up, give me your wallet." She looked out her window and saw a light-skinned male black with no shirt and dark pants. He testified that she believed a scuffle occurred, one man fell and the black man fled westbound on Balmoral. On cross-examination, Lucas testified that another officer interviewed someone else at the scene who indicated that a second offender might have been involved and was seen running northbound on Sheridan Road.

Ralph Archulita, a Chicago police sergeant, testified that he found two pieces of identification at the scene, one belonging to Ivan Leon and another to Julian Ciera.

Kimberly Rice, an acquaintance of the defendant, testified that at about 2:30 a.m. on August 8, 1985, Perry threw some rocks at her window at 5420 N. Sheridan Road and asked to be let in. She said she asked him what had happened because from the window she saw that he had a knife in his hand, a gash on his wrist and a little blood on him. She testified that the defendant had on no shirt, black pants and a pair of black boots.

She testified: "He told me he had got into a fight with someone, and then and a guy had got to struggling, and he robbed the guy. He thought he killed him." She testified that she opened a beer for defendant. She gave him a wet towel to wipe away the blood and then threw the towel in her closet. Later, a police detective, Stone, took the towel from the closet. She identified the towel in court.

She testified that when she buzzed defendant in and he came up to her apartment he no longer had the knife in his hand but had a brown-handled knife with a six-inch blade in his back pocket. She testified that he was intoxicated. She told him to calm down and dialed the phone for him because he said he needed to talk to a friend, Chuck Wade. She testified that Wade's girl friend answered the phone and said Wade wasn't there. She testified that she then went to the store to buy more beer, but stopped first to talk to police officers across the street who asked her how long she had been outside. She testified that while she was out there a police officer found a wallet near a mailbox. She testified that she paid for the beer with a blood-stained $10 bill defendant had given her and then returned home, where defendant explained what had happened.

Rice testified that Perry had injured his eye in a previous fight and told her he "just went off and stabbed" the victim when the victim hit him in the eye. She testified that she gave him some clothes and walked with him for a few blocks before they parted company.

She saw him the next day after she ran into his girl friend and they found defendant at a friend's apartment. She testified that he was drunk but that they dressed him and took him to another friend's house, Rick Wade's, where they cut defendant's hair and tried to remove a tattoo from his chest with bleach, alcohol and lemon juice. She testified that defendant was crying and told her he needed to stop drinking and was going to get help.

On cross-examination, she testified that when she spoke to him from the window he was hysterical but when he was in her apartment he only was drunk. After refreshing her recollection with grand jury testimony, she then testified that he was hysterical and crying in her apartment. She testified that she remembered giving grand jury testimony that defendant's hair was long, but she did not remember telling the grand jury that he had an Afro.

She testified that the cut was on defendant's left wrist. She testified that when she returned from the liquor store, the defendant made three phone calls. He told her he was sorry and said he hoped he hadn't killed the guy. She testified that during this second conversation she could not recall whether he mentioned that he robbed the guy. When asked whether she told the grand jury that Perry never mentioned robbery during their second conversation, she testified that she had no recall of that. Rice testified that she threw Perry's boots away because one of the heels was broken. She testified that she never went to the police because she was scared. On redirect examination she repeated a statement she had made to the grand jury that defendant told her he had a fight with someone, robbed him, stabbed him and thought he killed him.

Pamela Fish, a Chicago police department crime lab expert, testified that the blood type and blood enzymes in the towel found at Rice's apartment and in some of Ivan Leon's blood were identical. On cross-examination she acknowledged that she was never given a sample of defendant's blood to analyze.

Cheryl Williams, a girl friend of Ricky Wade, testified that Rice, the defendant and the defendant's girl friend stopped at her home on August 8, 1985, in the late afternoon or early evening. She testified that Perry told her he had robbed a man in the 5400 block of North Sheridan and that the man hit him in the eye while he was attempting to rob him. She testified that Perry told her he pulled out his own

knife and stabbed the victim from 12 to 14 times. She testified that Perry told her he stole a $10 and $5 bill from the victim's wallet and threw the wallet under the mailbox across the street, then he went to Rice's house.

She testified that before August 8, 1985, she had cleaned up a cut on Perry's arm that he suffered in a burglary at a shoe store. She acknowledged that she was currently on probation for juvenile pimping and solicitation. On cross-examination she denied she was ever told she could be prosecuted as an accessory to the murder.

Rick Wade, also known as Harold Wade, testified that Perry came to his house August 8 and told him he robbed $15 from a guy. He testified that the defendant told him he didn't know if the guy was dead and that he had given Rice $10 to buy alcohol. He testified that he had seen Perry the night before dressed in black pants and no shirt. He acknowledged that he had an attempted burglary conviction on his record and a pandering conviction, for which he was sentenced to two years.

On cross-examination Wade denied being told he could be prosecuted as an accessory to the crime. He testified that Perry never told him it was his intention to rob the victim from the very beginning but he understood that the incident had started as a fight. He testified that the first thing Perry told him was that he robbed the guy. He testified that he told Perry he had to leave because "it was obvious he had hurt somebody, he had killed somebody." Wade testified that after Perry read in the newspaper that the victim had died he told Wade he didn't mean to kill anybody.

The parties stipulated that the victim died of multiple stab wounds and the State rested its case. The defense then called witnesses in Perry's defense.

Charles Wade testified that he saw defendant briefly at his Franklin Park home on August 9 and defendant said the cuts on his arm were the result of a fight he had with someone. Wade's fiancee, Vivian Emrick, testified that she saw cuts on defendant's right and left arms.

Michael Federichi, a delivery person for the Wall Street Journal and part-time taxi driver, testified that he delivered papers to 5415 N. Sheridan Road at about 2 or 2:15 a.m. on August 8. He testified that as he left the building and pulled away in his car he saw two people standing next to each other at a sheltered bus stop on Sheridan near Balmoral. One man was wearing a dirty, white, long-sleeved shirt and dark brown or black pants. He testified that he believed they were both either Caucasian or Hispanic but did not believe they were black.

He testified that they crossed the street and then he saw them about 25 or 30 feet away "horsing around." Soon he saw one on the ground kicking at the other, who was still standing. He testified that the man standing had a shirt on. He testified that he had his window down and heard nothing. The defendant was told to stand in the courtroom, and Federichi testified that defendant did not look like the person he saw standing over the other man because defendant was thinner.

On cross-examination Federichi testified that he did not get a very good look at either person. On redirect examination he testified that he returned to the area 15 minutes later and discovered police there and a maintenance man cleaning blood off the sidewalk where he had seen the two people.

Teresa Suzy Mendoza, defendant's girl friend, testified that she received a phone call from the defendant at approximately 2 or 2:30 a.m. on August 8, 1985. She testified that it was Kim Rice's idea to buy Perry new shoes, get him some clothes, bandage his wounds and cut his hair. She testified that until that time he had an Afro hair style.

Mendoza testified that Rice had the motivation to lie about Perry because Perry was preventing Mendoza from working as a prostitute for Rice, which Rice wanted. Mendoza testified that she never worked for Rice as a prostitute. When asked why Rice might be motivated to lie about Perry, she testified that Rice was worried she would have to go to jail for helping Perry.

The defendant, Reginald Perry, testified that on the night of the incident he was drinking with friends for an hour or two and then intended to walk to another friend's house on Bryn Mawr. He testified that when he reached Balmoral and Sheridan he saw a man at the bus stop and they literally bumped into each other. He testified that the man asked him, "What you be [?]" which he interpreted to mean an inquiry about the street gang tattoo on defendant's chest. He testified that he received the tattoo six years ago when he was 12 and he denied gang membership at the time of trial.

Defendant testified that he told the man to leave him alone but the man swung at him twice, hitting him once in the eye and once in the jaw. He testified that he stumbled back but then stepped forward and then pushed the man in the chest. He testified that he asked the man if he was crazy and swore at him but the man just swore back at him. He testified that he then started walking east on Sheridan Road but that the man followed two or three feet behind, eventually pushing Perry from behind. Defendant testified that he turned around and

pushed back and the man took a swing at him. He testified that he fell to the ground and was lying on his back when he saw the man pull out a knife. He tried to kick the knife from the man's hand but the man dove on top of him with the knife and cut him three times, once on the hand and twice on the forearm.

Defendant testified that the two wrestled with the knife and he obtained control of it and began hitting the man with the knife. After about a minute he stopped. He testified that he managed to get up and he ran down Sheridan Road to his friend Kim Rice's house. He testified that he was crying and bleeding. He rang her doorbell and she let him in and gave him a beer.

He testified that he went to the bathroom to wipe his wounds with a towel and then came back and told Rice he had been in a fight and a guy had tried to kill him. Defendant testified that shortly after that Rice left the apartment without explanation and returned three or four minutes later with a wallet in her hand that she said she found. He testified: "I told her that the wallet might belong to the person I had the fight with and I told her her fingerprints would be on the wallet and she should get rid of it." He testified that she left again, returning five minutes later without the wallet and with a six-pack of beer. He testified that he phoned his girl friend while he was there.

Defendant denied ever giving Rice money or telling her that he had robbed someone. He testified that it was never his intention to rob or fight with the man and that he only took the knife away from the man and never turned the man's pockets inside out. Defendant testified that Rice had the motivation to lie about their encounter because Rice had wanted defendant's girl friend to work as a prostitute for Rice and Rick Wade's prostitution ring but that defendant had refused to allow it.

Defendant testified that he was at Rice's apartment for about 25 or 30 minutes and then the two left together although he proceeded alone to his friend Keith Allen's house on Bryn Mawr. He testified that he stayed at Allen's house overnight and was awakened the next day around noon by Rice, who was slapping him in the face. He testified that Rice told him the police were looking for him and she told him she was going to cut his hair.

He testified that he went to Rick Wade's house with his girl friend and Rice, but he denied telling Wade or his wife Cheryl Williams that he had robbed, stabbed and killed a guy. He admitted that when Rice brought in the newspaper about the person being killed, he told the people at Wade's house that "I hope that I didn't kill the person." He

denied telling Rick or Cheryl that he had tried to rob the man. He speculated that Wade was motivated to lie about him because the defendant would not permit his girl friend to work for Wade.

Defendant denied ever carrying a knife with him and denied showing up at the Wade home a week before the incident with cuts on his arm. He testified that later in the day he went to Chuck Wade's house, where he changed his bandages. He was picked up by police three weeks later.

He testified that he did not know the man he had the altercation with on August 8, 1985, and had no intention of robbing him. He testified that he stabbed the man because he feared for his life. Defendant stated: "I thought he was going to kill me."

On cross-examination, defendant acknowledged that after drinking with friends he walked from Irving and Sheridan (at 4000 N. Sheridan) to 5400 N. Sheridan. He testified that the victim, shown to him in a photograph, is the person he scuffled with that night.

He testified that though the man hit him in the eye, that did not make him mad and did not prompt him to start stabbing the man. He testified that the entire time he was stabbing the victim the victim was hitting him and he was afraid of the victim. "I was protecting myself, I thought that he was trying to kill me." He testified that he feared for his life the entire time he stabbed the victim even though the wounds included four stabs to the back and about six stabs in the chest.

He testified that when he arrived at Rice's house he did not use the big white towel displayed in court but rather used a small face cloth to wipe up the blood on his body. He testified that he "had an idea" Rice got the wallet off of the person he had a fight with, but he denied ever seeing the man's wallet. He acknowledged that the police were at the scene of his altercation with the man when he and Rice left her apartment.

He admitted that he changed into new pants and shoes the next day because he was concerned that the police would find out what he was wearing the night before. He testified that Rice cut his hair because she wanted to disguise him but he stated, "I wasn't trying to disguise myself."

Defendant testified that he told Rick Wade he had gotten into a fight the night before but he denied telling Wade he had stabbed the man. He acknowledged that he read the newspaper article about the stabbing but denied telling his friends anything more than that he had gotten into a fight. He testified that the man he met on the street that night spoke English to him, not Spanish.

On redirect examination he testified that he never called police because he was afraid the police would not believe his story.

The record indicates that while defendant was putting on his evidence, defendant filed a motion to dismiss the charges against him or in the alternative for a mistrial. The motion stated that on November 21, 1986, defendant learned that Rick Wade and Cheryl Williams testified before a grand jury with regard to the death of Gladys Powell, allegedly at the hand of Prentice Jackson. Defendant's case is unrelated to the Jackson case. The defense motion asked the court to order the State to produce the grand jury transcript. The State notes in its brief that the transcript was produced when identified and requested.

Dr. An, an expert in forensic pathology, testified for the defense and said he did the autopsy on the victim, Ivan Leon. He testified that some of the victim's wounds on the hand and the forearms were suggestive of a struggle. He characterized the wounds on the hand as "defensive wounds" or wounds sustained while someone was trying to defend himself. He testified that it would have been unlikely that the victim could have continued to struggle after receiving the fatal wounds to the chest but there was no way to tell which wounds occurred first. He testified that the body had 14 stab wounds and 10 "cutting" wounds. He testified that there were three abrasions on the body, on the left forehead, the left hip and the left ankle.

The defense then rested with the exception of "perhaps" bringing in Rick Wade to testify under subpoena. The court continued the case for approximately two weeks and then permitted the defendant to reopen his cross-examination of Harry "Rick" Wade, who had testified in the State's case in chief. The court stated that it would allow the defense to reopen its cross-examination of Wade only for the purpose of asking about Wade's grand jury testimony in the unrelated Jackson case.

Under re-cross-examination Wade acknowledged that he testified before a grand jury in September 1985 about a shooting that occurred in his building August 17, 1985, between Gladys Powell and Prentice Jackson. He testified that he went to the police willingly a few days after Powell was shot, but he never told the police about Reginald Perry.

Wade admitted that he told the grand jury investigating the Powell murder that he was freebasing cocaine four or five times a day from July 1985 to around August 8, 1985, the date of Leon's murder. He denied that the cocaine use would have affected his ability to perceive things around him. Defense counsel attempted to question Wade

about his drug arrest on March 18, 1985, and a pandering arrest on June 1, 1985. The court noted that the arrests were raised by the State in its case in chief and therefore the defense had ample opportunity to cross-examine Wade about these charges when it cross-examined Wade the first time. The court then permitted defense counsel to continue his questions with regard to Wade's prior arrests.

Wade admitted that he was arrested on the drug and pandering charges and that the State dropped the drug charge on October 1, 1985. He pleaded guilty June 1, 1986, to the pandering charge and was sentenced to two years but was released October 1, 1986. Wade admitted that the State did help him on the drug case by having it dismissed in exchange for help on the unrelated Prentice Jackson case.

A stipulation was entered into the record that if Detective Fred Stone were to testify he would state that neither Rice, Wade nor Cheryl Williams came to him and volunteered information about Perry's involvement in the crime. A stipulation was entered that if Detective Sikorski were called to testify he would testify that the victim's sister told him the victim had a drinking problem, was depressed and had threatened suicide.

After closing arguments, the trial judge found defendant guilty of armed robbery and of murder committed during an armed robbery. At the sentencing hearing, the trial judge found as a matter of law that imposition of the death penalty was improper. In imposing sentence the trial judge stated:

> "Mr. Perry, I have reviewed the presentence report, the circumstances of the offense that you have been found guilty of, and, of course, I am considering your potential for rehabilitation as the law requires me to. Even if it did not, I would consider it because I think it is the proper thing to do. At the time of this offense you were just three months into your 18th year, or I should say your 19th year. With the grace of God if you had committed this offense four months earlier, you could not even be considered eligible for the death sentence. However, you were eighteen years of age and you were a young man and you probably had more experience on the street than the average young man your age because of circumstances that you have no control over, circumstances that effected [*sic*] your life. So I feel a certain amount of sympathy for you. However, that sympathy does not mitigate against the impact that your act has on the entire community. It is not only rehabilitation that must be considered but the extent to which you represent a

danger to the community must be considered as well. We all come into this world with potential to do unspeakable harm and limitless good. What separates many of us is what we do with that capacity. Some people demonstrate the capacity to do harm and some don't, although we all share. In your case, you made that demonstration. You have gone out and killed another human being in a very cruel fashion. I think the community would be shocked if a minimal sentence were imposed."

The trial judge then sentenced defendant to the extended term of 50 years on the murder conviction and 30 years on the armed robbery, the sentences to run consecutively. Defendant moved for a new trial, alleging that: (1) the defendant should have been given immunity from the charges because he was offered immunity for testifying in another case and (2) the defendant was denied a fair trial because the State failed to turn over grand jury testimony regarding Rick Wade and Cheryl Williams until the middle of the defense's case. The trial court denied defendant's motion for a new trial.

Defendant appealed, raising four alleged errors at trial: the State's failure to turn over grand jury testimony regarding Wade and Williams, two alleged errors in sentencing and a contention that he was not found guilty beyond a reasonable doubt. As to the latter three arguments, we note the general rule that the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) We may, in the exercise of our responsibility for a just result, ignore considerations of waiver and decide a case on grounds even though they are not properly argued by a party. *Anderson v. Smith* (1980), 91 Ill. App. 3d 938, 940, 415 N.E.2d 643.

Defendant's appeal was dismissed for want of prosecution twice, on June 10, 1987, and on March 6, 1990. Two times the case was reinstated on defendant's motion.

Initially we consider whether the prosecutor's failure to tender grand jury transcripts of witnesses against defendant in response to a request for discovery prior to a commencement of trial deprived defendant of a fair trial.

Defendant alleges that the State violated Supreme Court Rule 412, which provides in pertinent part:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel." 134 Ill. 2d R. 412(a)(i).

The purpose of Supreme Court Rule 412 is to afford the accused protection against surprise, unfairness and inadequate preparation. *People v. Boucher* (1978), 62 Ill. App. 3d 436, 439, 379 N.E.2d 339.

Defendant contends that he requested the production of grand jury transcripts involving prosecution witnesses and the State's failure to turn over those transcripts was a violation of defendant's due process right. We note, however, that he does not discuss Cheryl Williams' testimony but only discusses the grand jury testimony of Rick Wade, on which we will focus. The State disclosed Wade's grand jury testimony in defendant's case, but defendant alleges the State failed to comply with Rule 412 when it did not disclose Wade's grand jury testimony in the Prentice Jackson case.

Defendant contends that he learned of Wade's testimony on September 11, 1985, in the Jackson investigation from another defense attorney only after the State had finished its case in chief. Defendant contends that the State's failure to produce this transcript prevented him from adequately preparing for inquiry into Wade's interests or bias. Defendant argues that knowledge of Wade's admission of drug use and pending criminal charges, disclosed before the Jackson grand jury, compromised Wade's testimony by demonstrating leniency to Wade in his pending cases. Defendant contends he was forced to call Wade in his case in chief by way of subpoena in order to impeach his testimony.

As the Illinois Supreme Court articulated in its 1964 decision *People v. Johnson* (1964), 31 Ill. 2d 602, 203 N.E.2d 399, grand jury minutes must be made available to a defendant for purposes of impeachment. In *Johnson* the court found none of the reasons to keep grand jury testimony secret was present when the defendant sought grand jury testimony of one witness who had already testified for the State. The court stated:

"Plainly the disclosure of grand jury minutes after an indictment is returned and the case proceeds to trial will involve no

danger of flight by the accused and no risk of damage to his reputation. Nor is it to be expected that he will tamper with a witness who has already testified against him. There will be no impediment to future grand jury deliberations since such deliberations will remain secret." *Johnson*, 31 Ill. 2d at 606.

Compliance with the discovery rules is mandatory (*People v. Miles* (1980), 82 Ill. App. 3d 922, 403 N.E.2d 587), and it is reversible error to deny a defendant access to statements of prosecution witnesses, properly shown to exist and related to impeachment purposes. *People v. Telio* (1971), 1 Ill. App. 3d 526, 530, 275 N.E.2d 222, *cert. denied* (1972), 409 U.S. 857, 34 L. Ed. 2d 102, 93 S. Ct. 138.

The State offers no excuse for the nondisclosure of the grand jury testimony but instead contends that it was under no obligation to disclose grand jury testimony State witnesses gave relating to other unrelated cases. The State contends that defendant's request is "ridiculous, unreasonable and would place an undue hardship on the State's Attorney's office" if the State was forced to look for any statement or testimony ever given by a State witness in an unrelated grand jury proceeding.

In the alternative, the State argues that the failed disclosure was harmless because the defense attorney did learn of the transcripts and was permitted to bring Wade to the stand and to reopen his cross-examination.

■■ Wade's prior criminal convictions with regard to a burglary conviction and a pandering conviction were disclosed during the State's direct examination of Wade and therefore defense counsel had an adequate opportunity to cross-examine Wade about the convictions. At no time did defendant request a delay because he believed he did not have adequate time to prepare.

We find no error in the State's failure to disclose Wade's and Williams' grand jury testimony. As the *Telio* court observed, one of the primary goals in the search for truth at a trial is to determine the credibility given to the testimony of witnesses. (*Telio*, 1 Ill. App. 3d at 530.) But *Telio* also stated that disclosure is required for statements properly shown to exist and related to impeachment purposes. *Telio*, 1 Ill. App. 3d at 530.

Setting aside the compelling argument that the trial judge stated he would find defendant guilty absent Wade's and Williams' testimony, we find Wade's grand jury testimony in the Prentice Jackson case unrelated for impeachment purposes. We note that in his pretrial discovery request for statements by witnesses, the query was a general one and did not specifically identify the Jackson grand jury testi-

mony. We agree with the State that were we to order the State to search every grand jury proceeding for testimony given by any State witness in a criminal trial we would place an impossible burden on the State which is not required or desirable.

The court found relevant Wade's grand jury admission that he was addicted to drugs, not for purposes of impeachment of Wade, but rather it was relevant to determine the credibility of Wade's testimony. Defendant cannot contend that all the criminal charges pending against Wade were unknown to him until disclosure of the grand jury testimony because Wade testified that he had been convicted of burglary and pandering. The defense questioned Wade about the charges on cross-examination and then the court permitted additional cross-examination on Wade's criminal history when the defense was permitted to reopen its cross-examination of Wade. We find defendant had adequate opportunities to cross-examine Wade.

We find that Rule 412 was not thwarted by the State. The disclosure of the grand jury testimony during trial did not deprive defendant of adequate time to prepare nor did it result in unfairness to defendant. We hold that the State's failure to tender grand jury transcripts of Wade's testimony as a witness in an unrelated case did not violate defendant's due process right and deny him a fair trial.

Next we consider whether defendant was proven guilty of the crimes charged beyond a reasonable doubt.

The test for sufficiency of evidence is whether, when viewed in the light most favorable to the prosecution, a rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 48-49, 538 N.E.2d 453.

Defendant alleges he was not found guilty beyond a reasonable doubt and asks this court to remand the matter for possible conviction on the lesser included offense of manslaughter. Defendant contends he should have been convicted of the lesser included offense of manslaughter based on his intoxication or serious provocation by the victim.

The defense of intoxication is permitted under limited circumstances. "A person who is in an intoxicated *** condition is criminally responsible for conduct unless such conduct either: (a) Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense; or (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ill. Rev. Stat. 1987, ch. 38, par. 6—3.

The defense of serious provocation based on mutual combat is described in the Criminal Code of 1961 as: "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by *** the individual killed. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).

Defendant contends that the evidence established both his intoxication and the serious provocation. Defendant contends that his testimony was "uncontroverted" that he was drunk, that the victim had punched him in his injured eye and that the two struggled. We note that only the defendant and the victim were present at the time of the occurrence. Defendant argues that State witness Rice testified defendant was drunk and told her he did not mean to kill the victim. Defendant points to Dr. An's testimony of "defensive wounds" on the victim's hand as a sign that the two struggled before the fatal wounds were inflicted. Frazier testified that she believed a struggle occurred and Federichi testified that he saw a struggle from a distance of approximately 30 feet.

Defendant cites *People v. Miller* (1981), 96 Ill. App. 3d 212, 421 N.E.2d 406, to support his serious provocation position. In *Miller*, however, the court affirmed a trial court finding of no mutual combat or serious provocation when a man shot and killed his live-in girl friend after discovering her on the phone speaking with another man. The court held that words shouted back and forth and a limited degree of pushing and shoving did not amount to the type of mutual combat on equal terms needed to indicate sufficient provocation to reduce a murder conviction to manslaughter. *Miller*, 96 Ill. App. 3d at 215.

Defendant cites *People v. Proper* (1979), 68 Ill. App. 3d 250, 385 N.E.2d 882, to support his intoxication position. In *Proper*, the court affirmed the trial court finding of no intoxication when the evidence established defendant had a coherent and detailed recollection of the events which occurred immediately prior to the shooting and the only evidence of defendant's alleged drunkenness was his testimony that he "guessed" he was drunk. *Proper*, 68 Ill. App. 3d at 254.

The State argues that defendant's guilt was proven beyond a reasonable doubt based on: Frazier's testimony that she heard someone shouting "Give me your wallet," heard a fracas, saw the victim fall to the ground with blood on his shirt and saw a young man without a shirt running down Balmoral Street; Rice's extensive testimony about the events of the evening; testimony of Wade and Williams that

defendant told them he robbed the victim; Dr. An's testimony that the victim died of multiple stab wounds and suffered defensive-type cuts on his arms; and defendant's testimony that he stabbed the victim multiple times.

The State rejects defendant's contention that he should have been found guilty of the lesser included charge of manslaughter based either on intoxication or serious provocation, contending defendant was voluntarily drinking with friends that night and therefore does not fit into the section (b) exception. The State argues that there is no evidence to establish defendant was so intoxicated that his power of reason was suspended.

The State argues that the serious provocation defense requires proof of mutual combat that is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat. (*People v. Austin* (1989), 133 Ill. 2d 118, 125, 549 N.E.2d 331.) The State argues that no such evidence exists here where defendant approached the victim to rob him and the fight that ensued was proven to be the result of the victim defending himself.

In *Austin,* a Chicago Transit Authority bus driver was killed when she struggled with a passenger who had paid only 80 cents instead of the $1 fare. The two argued, then hit each other and a struggle ensued. The driver was killed when Austin took out a gun and fired, first into the floor of the bus and later at the victim while the two struggled outside of the bus. The appellate court reversed but the supreme court upheld the trial court finding of no evidence of mutual combat because the record showed the driver did not enter the struggle willingly, and the fight was not on equal terms. *Austin,* 133 Ill. 2d at 125.

█ We agree with the State that there is insufficient evidence of either intoxication or serious provocation to reduce defendant's murder conviction to manslaughter.

As to the intoxication defense, the record establishes only that defendant drank a quantity of beer during a two-hour time period immediately prior to the killing. Defendant did not testify that he was so drunk he couldn't walk or think. In fact defendant testified that he walked from his friend's house approximately two miles north to the place where the killing occurred. He testified in detail about his version of the struggle and stabbing. He went to Rice's house and rang her bell without difficulty, cleaned himself up, spoke on the phone and admitted he told Rice to get rid of the wallet she found because he thought it might belong to the victim. These are not the actions and

thoughts of a man who was so intoxicated that his power of reason was suspended.

Likewise we see no evidence of serious provocation that would place defendant's culpability at the level of the lesser crime of manslaughter. Defendant contends that his uncontroverted testimony established that the victim pushed him, swore at him and pulled a knife on him. Defendant relies on Federichi's testimony, but Federichi admitted under cross-examination that he was not paying too much attention to the encounter he noticed. State witnesses testified that defendant always carried a knife and others testified that defendant told them he robbed the victim. The trial judge is in the best position to determine the credibility of the witnesses.

When viewed in the light most favorable to the prosecution, the evidence does not establish defendant faced serious provocation which resulted in mutual combat on equal terms. One who instigates combat cannot rely on the victim's response as evidence of mutual combat sufficient to mitigate the killing of that victim from murder to manslaughter. *Austin*, 133 Ill. 2d at 126.

We affirm the trial court finding that defendant was proven guilty beyond a reasonable doubt.

Finally we consider whether the imposition of consecutive sentences for the convicted crimes was excessive under the facts and circumstances of this case.

The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11.

A court may order that two or more convictions be served consecutively under conditions articulated in section 5—8—4(b) of the Unified Code of Corrections:

> "The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b).

Defendant contends that the trial judge erred because he failed to set forth any reasons on the record for the imposition of consecutive sentences. Defendant makes several references to the evidence to support his argument that imposition of consecutive sentences was inconsistent with the statute. He contends the State offered no evidence in

aggravation at the sentencing hearing and defendant offered in mitigation the facts that defendant had no prior criminal record, was 18 years of age at the time of the offense, came from a broken home, was made a ward of the State and had been bounced between 10 foster homes in 12 years.

Defendant argues that imposition of consecutive sentences in this case was an abuse of discretion. Defendant cites *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233, and *People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606, to support his position. *Carlson* was a death penalty case where the majority found error in the imposition of the death sentence because of the trial judge's failure to consider defendant's previous crime-free lifestyle as a mitigating factor. (*Carlson*, 79 Ill. 2d at 587-90.) In *Steffens*, the defendant's 30-year sentence for murder was reduced to 20 years after the appellate court found that the trial court did not properly take into consideration defendant's rehabilitative potential based on his age of 16, lack of significant prior criminal record and other circumstances of the case. *Steffens*, 131 Ill. App. 3d at 151-53.

The State contends that the sentence was appropriate because the trial judge articulated his reason for imposing consecutive sentences when he stated that the victim was killed "in a very cruel fashion and that the community would be shocked if a minimal sentence were imposed."

■■ We do not find the trial judge's comment on the record that "the community would be shocked if a minimal sentence were imposed" to be a sufficient statement that the judge was "of the opinion that [consecutive sentences were] required to protect the public from further criminal conduct by the defendant." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b).) The sentence of 50 years for murder is far from a minimal sentence when the range for sentencing is 20 to 60 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).) The sentence of 20 years for the armed robbery conviction where the permissible range is between 6 and 30 years also is not a minimal sentence. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3).

Though defendant committed the murder in the course of a felony, defendant was just a few months past his 18th birthday at the time of the offense and had no prior criminal record. Under the mitigating factors in this case and because sentences substantially greater than the minimum have been imposed, the community concerns have been adequately addressed. We see no compelling or appropriate reason to require the defendant to serve the sentences consecutively.

Accordingly we reverse court's order that the sentences be served consecutively and order the mittimus amended to provide that the sentences shall be served concurrently.

For all the foregoing reasons, we affirm defendant's convictions and affirm his sentences of 50 years for the murder and 30 years for the armed robbery. We reverse the order of the court which requires that the sentences be served consecutively and order that the mittimus be amended to order that the sentences be served concurrently.

Affirmed in part and reversed in part.

EGAN, P.J., and McNAMARA, J., concur.