THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SIDNEY PERRY, Defendant-Appellant.

First District (6th Division)   No. 1—96—0037

Opinion filed September 30, 1997.

706

ZWICK, J.; dissenting.

Rita A. Fry, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Jean T. McGuire, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

A jury found defendant Sidney Perry guilty of first degree murder for the shooting death of William Yousef, of armed robbery of William Yousef, and of armed robbery of Hani Hamad. The trial court imposed a sentence of natural life in prison without parole for the murder. Defendant now appeals his convictions and sentence.

On appeal, defendant raises five issues: (1) whether the trial court committed reversible error by refusing to instruct the jury on second degree murder; (2) whether he is entitled to a new trial based on the trial court's answer to a jury question and his trial counsel's failure to object to the trial court's response to the jury; (3) whether his convictions must be reversed because he used psychotropic medica-

tion during his trial; (4) whether the sentence of natural life in prison is void; and (5) whether the sentence constituted an abuse of the trial court's discretion. In addition, the State asserts that this court should remand this case for sentencing on the two counts of armed robbery.

For the reasons that follow, we affirm defendant's convictions and sentence. We also remand the cause to the trial court for sentencing on the two counts of armed robbery of which defendant was convicted but for which no sentence was imposed.

On September 12, 1994, William Yousef (William) and his cousin Hani Hamad (Hamad) were robbed while working in a closed food store at Central and Lake Streets. During the robbery, William suffered a gunshot wound to the abdomen and subsequently died from the gunshot wound on September 22, 1994. Both defendant and Moses Cathey were charged for the crimes. Defendant and Cathey were tried simultaneously but before separate juries.

In short, the State's position at trial, supported by the testimony of victim Hamad, was that two men (defendant and Cathey) entered the store, each man had a gun, they wanted money, and defendant shot William. On the other hand, defendant testified that he entered the store alone and unarmed, that William pulled a gun, they scuffled over the gun, and William shot himself.

At trial, the State presented, in its case in chief, the testimony of Hamad (a robbery victim), Ken Witkowski (a police officer), Thomas Reynolds (a forensic investigator), Cynthia Porterfield (a medical examiner), and Robert Smith (a firearms expert). In rebuttal, the State presented the testimony of Nayim Yousef (the owner of the store and William's uncle) and recalled Witkowski for further testimony.

Hamad testified that Nayim Yousef, William's uncle, bought a grocery store at Lake and Central. The store had been closed for business. On September 11, 1994, a Sunday, Hamad, William and Nayim were working in the store to prepare for the store's opening. Defendant entered and asked if any work was available. After working about two hours, defendant asked Hamad for $40. Hamad referred defendant to the owner, Nayim, who gave $20 to defendant. All four men (Hamad, William, Nayim, and defendant) then left the store for the day.

The next day, September 12, 1994, Hamad, William and Nayim returned to work in the store. Defendant came to the store again asking for work but was told that no help was needed. After defendant and Nayim left the store, Hamad and William continued the work in the store.

Hamad testified that defendant returned to the store with a

"partner." While the second man stood by William about 15 feet away, defendant stood in front of Hamad and said "give me all the money you have." Hamad replied that he did not have any money. Defendant then pulled a black gun, said "No more money, m----------?" and fired one shot. The shot went behind Hamad and into the glass. Hamad turned to see his cousin William and observed the second man put a small silver gun in William's face. Hamad told defendant: "Hold on, man. My money in my pocket. Take anything you want. We have cigarettes. Take anything you want, just don't shoot."

Hamad testified that defendant then told him to remove his pants. As Hamad complied, his wallet fell to the floor. Defendant took Hamad's wallet, which contained about $100, and told Hamad to "take the floor." As Hamad got on his knees with the palms of his hands on his thighs, defendant said "give me the watch" and Hamad complied. Hamad saw William assume the same position after being told to do so by the second man, who was standing in front of William. William had also removed his pants and the second man took William's wallet.

Hamad next heard a second gunshot but does not know who fired the second shot. When the second shot was fired, Hamad was completely on the floor and he could not see William from that position. After the second shot, Hamad heard shelves fall and somebody run away.

As Hamad tried to stand up, defendant fired more shots and Hamad returned to the floor. At the time of the third shot, both men were standing in the doorway and the shot hit a pop bottle. The two men left the store. After the third shot, Hamad saw William on the floor in a prone position. Hamad then went to the front of the store and closed and locked the security gate.

Hamad returned to William, who was on the floor. William said that "they shot me." Hamad saw a little blood on William's stomach.

Hamad was unable to call the police since no phone had been installed in the new business. Hamad told a lady in front of the store to call the police and she did. The police arrived, cut the gate, and entered the store. William was taken to the hospital by ambulance.

Hamad told the police what had happened and then accompanied the police to the hospital to see William, who was unconscious. Later the same day, Hamad went to the police station and identified defendant in a lineup. Hamad noticed that, at the police station, defendant's hair had changed because he had cut off his ponytail, which fact Hamad told the police.

The next day, Hamad returned to the police station and identified a black gun as one that looked like the same gun defendant had used during the store robbery.

Hamad denied that William and defendant argued or engaged in a fight. Hamad also denied that William pulled a gun, that William and defendant struggled over the gun, and that the gun fired as the two of them were struggling over it. Hamad did not see William facedown with his chest on the ground.

Hamad denied telling the police detective that the robbers told him and William to lie facedown. Hamad testified that he took two positions during the robbery. The first time, he was on his knees, and the second time, he was on his hands and knees with his head down. Hamad told the police officers immediately after the robbery that the robbers told him "to go down."

Nayim Yousef testified that, in September 1994, he purchased a small grocery store near Lake and Central Streets. On September 11, 1994, Yousef, Hamad and William worked in the store to prepare it to open for business. On September 11, Yousef hired defendant to do some work. Defendant worked for two hours and Yousef paid defendant $20. On September 12, 1994, defendant returned to the store and asked for work. Yousef informed defendant that he did not need him that day because the store was almost ready. Defendant then left the store and Yousef left the store about 15 minutes later. When Yousef left, the front door was unlocked and Yousef had the keys. When Yousef left, both Hamad and William were wearing pants. Yousef never talked to the police and never was contacted by the State's Attorney about the subject matter of his trial testimony.

Police officer Kenneth Witkowski testified that on September 12, 1994, at 2:15 p.m., he responded alone to a radio message of a man shot in a store. When he arrived at the store, Witkowski found Hamad locked behind some burglar bars screaming for help. Witkowski forced his way in under the burglar bars, observed William lying on the floor, appearing to be unconscious, radioed for help, made sure an ambulance was on the way, and called for a fire truck to break the burglar bars. Witkowski testified in rebuttal that he found William lying on the floor and wearing only a sleeveless t-shirt and a pair of white briefs. In his police report, Witkowski did not mention that William was not wearing any pants.

Witkowski noticed that some of the store merchandise was damaged and soda was all over the floor. Witkowski observed that Hamad was visibly shaken, agitated and demanding help for William. When Witkowski first arrived on the crime scene, he did not ask Hamad if there was a struggle when the men came into the store. Witkowski drove Hamad to the hospital. At the hospital, Witkowski tried to gather information about the incident, learned that William was in critical condition, and met with Detective Anthony Bongiorno.

Witkowski returned to the store to canvass the area. After some investigation, Witkowski and Bongiorno obtained the name of a possible offender. While Bongiorno was on the phone and Witkowski was inside a shoeshine parlor, defendant entered the store and identified himself by name and as "the guy you are looking for." Witkowski testified that he (Witkowski) was "kind of in shock" and defendant put his hands behind his back. Witkowski handcuffed defendant and read defendant the *Miranda* rights. The two police officers then transported defendant to the police station. At a lineup, Hamad identified defendant.

After a phone call to Detective Bongiorno, the two police officers returned to the area of the store (333 North Central). A young black male teenager approached the car and threw a bag in Witkowski's lap. The bag contained a .380 Lorson semi-automatic pistol. Upon returning to the police station, Witkowski showed the gun to Hamad and Hamad said that it looked like the gun defendant had used. Witkowski did not take the gun to be dusted for prints.

Thomas Reynolds, a forensics investigator with the Chicago police department, testified that he and his partner went to the crime scene on September 12, 1994. Reynolds located three discharged cartridge cases, one fired bullet, and one copper jacket from a bullet. A copper jacket is a part of a fired bullet. One discharged cartridge case was found on the floor near the coolers, and William had been found lying in front of the cooler. A second discharged cartridge case was located on the floor near some shelving on the floor. A third discharged cartridge case was on the floor in front of one of the coolers. The fired bullet was located inside a case of soda pop. The copper jacket was recovered near the bullet hole in a display area between the window and the outer wall. The three discharged cartridges came from a .380-caliber bullet.

At the scene, Detective Bongiorno did not request that Reynolds perform a gunshot residue test on William or Hamad or defendant. Reynolds dusted for fingerprints at the front door and at the cooler. Detective Bongiorno never assigned Reynolds to go to the hospital to view or recover William's clothing, and Reynolds never tested William's clothing for gunshot residue. The items recovered by Reynolds were inventoried and taken to the Chicago crime lab for analysis.

Police officer Robert Smith, a firearms expert, was not able to form an opinion as to whether the cartridge casings of fired bullets had been fired from only the recovered gun, but they could have been. The bullet recovered from the inside of a soft drink case in the store was fired from the submitted gun to the exclusion of all others. Smith testified that the bullet recovered from William's body by the

medical examiner had been fired from the recovered weapon (the black gun).

Assistant Medical Examiner Cynthia Porterfield performed the autopsy on William on September 23, 1994 (the day after he died), testified that he died from a gunshot wound to the abdomen, and opined that the manner of death was a homicide. Porterfield testified that William was 21 years old, measured 5 feet 9 nine inches tall, and weighed about 260 pounds. William sustained a single gunshot wound to his left abdomen. The bullet travelled from front to back, from left to right, and in a downward direction. Porterfield retrieved a medium-caliber fully copper-jacketed bullet from the muscles of the right back.

The only other injury Porterfield found on William's body was a small abrasion, similar to a scratch, on his left thigh. William's body was unclothed when Porterfield received him and she never examined William's clothing. If the shooting victim was positioned on his hands and knees and the shooter was standing, the gun would have had to have been below the victim's body because the bullet went from front to back. William's wound could not have been sustained if he were lying on his stomach or face.

Defendant testified that he worked about seven hours in Nayim Yousef's store on September 10, 1994 (a Saturday), and about eight hours at the store on September 11, 1994 (a Sunday). Defendant testified that he was not paid on either day.

On September 12, 1994, defendant returned to the store to seek payment for his work. Hamad and William were at the store. Defendant asked William for the money. William refused, saying that defendant had broken a shelf and the money he earned would have to pay for the shelf. Defendant claimed that the shelf broke when he and Hamad slipped their hold of the shelf and it shattered. When shown a photograph of the crime scene, defendant testified that the broken shelf in the picture was not the shelf that he had broken.

Defendant and William began a verbal argument over the money, and William uttered a racial slur. William then swung at defendant and defendant swung at William, but neither man made contact. The verbal argument and missed punches lasted about three minutes. After the missed punches were thrown, William reached behind his back and pulled out a gun. Defendant identified the recovered gun as the gun belonging to William.

Defendant testified that he grabbed William and the two men were struggling while William held the gun. The struggle over the gun lasted about 10 or 15 seconds. The gun discharged about three times while defendant and William were struggling for the gun. De-

fendant initially testified that he did not know where the first shot went but later stated that the first shot went toward the ceiling. Defendant thought that William was struck by the second or third shot. The gun was in William's hand when William was shot. Defendant got hold of the gun after the third shot was fired.

Defendant told Hamad to get away from the door and testified he ran away with the gun because he was afraid of going to jail. After leaving the store, defendant threw the gun in a trash can and ran to his apartment. From the incident in the store, defendant had a little blood on his shirt, so he threw away the shirt. Later, defendant attempted to locate the police and he surrendered in the shoeshine parlor.

Defendant testified that he went to the store alone without a gun and did not get money while he was there. Defendant denied that he fired a shot at Hamad and denied that William and Hamad removed their pants. Defendant testified that he never had a ponytail.

Defendant testified that he initially lied to the police and said he knew nothing about the shooting of William because he was afraid he would go to jail. Defendant said he was now telling the truth because he does not feel responsible for the shooting. Defendant testified that "I didn't pull the trigger. He [William] pulled the trigger, I didn't." Defendant also testified: "I didn't shoot him. He shot himself. *** We were struggling over the gun." The State asked: "Well. [D]id the gun go off accidentally or did William Yousef pull the trigger?" Defendant replied: "Accidentally?" Defendant also testified that it was a "mistake" to say that William pulled the trigger.

Defendant called Detective Anthony Bongiorno as a witness. Bongiorno testified that, during his interview with Hamad at the crime scene, Hamad told him that only one man fired shots. Bongiorno thought that the sequence of events was that one offender hit one of the victims with the gun, the gun went off, the victims were made to lie on the floor, and then additional shots were fired. Bongiorno thought that Hamad had told him that the victims were made to lie on the floor before any shots were fired. Bongiorno does not recall Hamad telling him that Hamad stood up and a third shot was fired at him. Bongiorno does not recall asking an evidence technician to run a gunshot residue test on William, Hamad, or defendant, nor does he recall asking that a latent fingerprint test be run on the gun in this case.

The parties stipulated that defendant had five prior felony convictions (August 7, 1984; June 21, 1985; August 7, 1987; October 17, 1987; and July 13, 1990).

During the instructions conference, defense counsel requested

jury instructions on both second degree murder and involuntary manslaughter. The trial court allowed the instruction on involuntary manslaughter but refused the instruction on second degree murder.

During the jury deliberations, the jury sent a note asking in relevant part whether it was "legally possible for the jury to return a verdict of guilty of armed robbery and guilty of involuntary manslaughter." After consulting with both the State and defense counsel, and with their approval, the trial court responded in a written note stating "[p]lease read the instructions & continue to deliberate."

After further deliberation, the jury found defendant guilty of first degree murder for the death of William. The jury also found defendant guilty of two counts of armed robbery, *i.e.*, for William and Hamad.

After the jury verdict was rendered, a fitness hearing was held and it became known that defendant was receiving psychotropic medication. Defendant was found fit for the sentencing hearing. The trial court imposed a sentence of natural life imprisonment.

Defendant first asserts that his testimony regarding his struggle with William established mutual combat sufficient to warrant the giving of a jury instruction on second degree murder based on provocation. We disagree.

■ Second degree murder occurs when a person commits first degree murder and a mitigating factor is present. 720 ILCS 5/9—2 (West 1994); *People v. Porter*, 168 Ill. 2d 201, 213 (1995).

The second degree murder statute recognizes two mitigating factors: (1) "a sudden and intense passion resulting from serious provocation"; and (2) an unreasonable belief in self-defense. 720 ILCS 5/9—2(a)(1), (a)(2) (West 1994). In the present case, defendant asserts the serious provocation category, not self-defense.

Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9—2(a)(2)(b) (West 1994). The law recognizes that mutual quarrel or combat can be the kind of provocation to reduce first degree murder to second degree murder. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995).

Mutual combat is defined as "a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. Austin*, 133 Ill. 2d 118, 125 (1989).

Mutual combat, however, does not constitute a fight where one of the parties acts in self-defense. *People v. Delgado*, 282 Ill. App. 3d 851, 858 (1996), citing *People v. Lewis*, 229 Ill. App. 3d 874 (1992). " 'Struggling with an attacker in an effort to ward off or defend one's self against an assault is not sufficient to warrant a provocation

instruction.' " *Delgado*, 282 Ill. App. 3d at·858, quoting *Lewis*, 229 Ill. App. 3d at 881. Where a defendant finds himself the unwilling participant in a fight and acts only to defend himself from an attack, he is not entitled to a provocation instruction based on mutual combat. *Delgado*, 282 Ill. App. 3d at 859.

Moreover, one who instigates combat cannot rely on the victim's response as evidence of mutual combat to mitigate the killing of that victim from first degree to second degree murder. *Austin*, 133 Ill. 2d at 126; *People v. Flores*, 282 Ill. App. 3d 861, 867-68 (1996) (no abuse of discretion in refusing to give the defendant's provocation instruction based on mutual combat); *People v. Perry*, 226 Ill. App. 3d 326, 343 (1992) (no evidence of serious provocation to warrant the lesser crime of manslaughter, now codified as second degree murder).

In *Perry*, the court concluded that there was no evidence of serious provocation where the defendant contended that his uncontroverted testimony established that the victim pushed him, swore at him and pulled a knife on him. The State, on the other hand, presented witnesses who testified that the defendant always carried a knife and the defendant robbed the victim. *Perry*, 226 Ill. App. 3d at 343. The State, therefore, argued that the defendant approached the victim to rob him and the fight that ensued was proven to be the result of the victim defending himself. *Perry*, 226 Ill. App. 3d at 342.

■ Whether to give a specific jury instruction is within the discretion of the trial court. *Garcia*, 165 Ill. 2d at 432. In the present case, the defendant's testimony, at best, reveals that he was an unwilling participant in the struggle with William and acted only in self-defense. Self-defense, however, does not entitle defendant to a provocation instruction based on mutual combat. In addition, the State presented evidence to show that defendant entered the store to commit armed robbery. In such a case, defendant instigated the combat and cannot rely on his alleged struggle with William to mitigate the offense of first degree murder. We find that the trial court did not abuse its discretion in denying defendant's tendered jury instruction on second degree murder based on provocation.

Second, defendant asserts that the trial court committed reversible error in its response to a question posed by the jury. In the alternative, defendant submits that he was denied effective assistance of counsel because his trial counsel agreed to the court's response to the jury's question.

■ It is well established that both a contemporaneous objection at trial and the subsequent inclusion of the challenged issue in a post-trial motion are required to preserve an issue on appeal. *People v. Young*, 128 Ill. 2d 1, 38-39 (1989); *People v. Enoch*, 122 Ill. 2d 176, 190

(1988). Defendant acknowledges that this issue was not properly preserved because his trial counsel agreed to the court's response to the jury's question and this issue was not included in his posttrial motion. Accordingly, we find that this issue is waived and is not preserved for appeal.

Plain error may be invoked where the evidence was closely balanced or the error was of such magnitude that the accused was denied a fair trial. *People v. Redd*, 173 Ill. 2d 1, 27 (1996). Neither circumstance is present in the instant case to warrant the application of the plain error doctrine.

We recognize that, under a similar fact pattern, a question posed by the jury and a similar response by the trial court resulted in the reversal of the defendant's conviction in *People v. Childs*, 159 Ill. 2d 217 (1994). In *Childs*, however, the trial court's response to the jury's question derived from an *ex parte* communication between the judge, the prosecutor and the jury. In addition, the defense counsel in *Childs* objected to the trial court's response after hearing of it. Moreover, the trial court made no attempt to clarify the question posed by the jury even though it did not fully understand the question. The supreme court concluded that, under the facts of *Childs*, the State "failed to sustain its burden of proving that the trial court's improper *ex parte* communication to the jury was harmless beyond a reasonable doubt." *Childs*, 159 Ill. 2d at 235.

Unlike *Childs*, however, no *ex parte* communication occurred in the instant case. Furthermore, there is no indication that the trial court or counsel were confused by the jury's question or needed any clarification of it. More importantly, defense counsel was consulted by the trial court and agreed to the response given by it to the jury. The law affords all counsel the right to determine his or her own trial strategy. Defense counsel may have believed that any confusion by the jury as expressed in its note would benefit defendant. While we agree with the general rule as restated in *Childs*, that the trial court has a duty to provide instruction to the jury under certain circumstances (*Childs*, 159 Ill. 2d at 229), we also must point out that the defense counsel in *Childs*, unlike defense counsel in the instant case, had no opportunity to agree or disagree with the trial court's response to the jury's question because defense counsel only learned of the matter after the deed had been done. In the instant case, defense counsel, indeed, had input and a choice on the response given by the trial court. To deny defense counsel the right to make such strategy decisions would deprive defendant of meaningful representation.

Third, defendant asserts that his conviction should be reversed

because he was on psychotropic medication during his trial and was not afforded a fitness hearing at that time. In the alternative, defendant maintains that he is entitled to a retrospective hearing.

The psychotropic medication statute has undergone several versions. Effective December 28, 1979, through December 12, 1995, section 104—21(a) of the Code of Criminal Procedure of 1963 provided:

> "A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." 725 ILCS 5/104—21(a) (West 1994).

By amendment in 1995 under Public Act 89—428, section 104—21(a) provided:

> "A defendant who is receiving psychotropic drugs under medical direction is entitled to a hearing on the issue of his or her fitness while under medication; however, no hearing is required unless the court finds there is a bona fide doubt of the defendant's fitness." 725 ILCS 5/104—21(a) (West Supp. 1997).

Pub. Act 89—428, eff. December 13, 1995. Public Act 89—428, however, which effected the 1995 amendment, was declared unconstitutional as violative of the single-subject requirement of the Illinois Constitution in *Johnson v. Edgar*, 176 Ill. 2d 499 (1997).

By amendment in 1996, section 104—21(a) currently provides:

> "A defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications." 725 ILCS 5/104—21(a) (West 1996).

Pub. Act 89—689, eff. December 31, 1996.

Defendant's jury trial was held on September 5, 6, and 7, 1995. Defendant's sentencing hearing was held on November 6, 1995. Accordingly, the initial version of the statute was in effect at the time of defendant's trial and sentencing.

The State, however, maintains that the 1996 amended version of this statute should apply because this appeal was pending after the statute was amended. The State maintains that the 1996 amendment is procedural in nature and thus applies both to cases subsequently filed and retrospectively to cases pending on the effective date.

On June 20, 1996, the supreme court filed two opinions that are difficult to reconcile: *People v. Birdsall*, 172 Ill. 2d 464 (1996), and *People v. Nitz*, 173 Ill. 2d 151 (1996).

In *Birdsall*, the retrospective application of the 1995 amendment to section 104—21 was found not to apply to a case that was pending in the supreme court. *Birdsall*, 172 Ill. 2d at 475 n.1. The crime in *Birdsall* occurred in 1993 and the supreme court issued its opinion in June 1996. The defendant's pending appeal before the supreme court

in *Birdsall* did not warrant retrospective application of the 1995 amended version of section 104—21.

However, in *Nitz*, the supreme court noted "the rule that amendatory acts which are procedural in nature have retrospective operation for matters which are *pending* on the effective date of the amendment or are subsequently filed. [Citations.] As this is a collateral matter [postconviction proceeding], the amendment, though procedural in nature, does not apply." *Nitz*, 173 Ill. 2d at 162-63. Accordingly, the supreme court characterized section 104—21 as "procedural in nature" and, thus, amendments to the statute are subject to retrospective operation for pending matters.

In a 1997 supreme court opinion dealing with the psychotropic drug statute, the supreme court expressly declined to consider the State's argument that the amended version of the statue controlled the appeal. *People v. Burgess*, 176 Ill. 2d 289, 305-06 (1997) (filed April 24, 1997). In *Burgess*, the supreme court only cited the *Birdsall* footnote that summarily stated that the amended statute was not applicable in that case and did not refer to the *Nitz* discussion of the procedural nature of the statute. *Burgess*, 176 Ill. 2d at 306.

In its most recent decision, the supreme court again found that it need not decide the question of whether the amended or the prior version of section 104—21(a) applied to the appeal. *People v. Kidd*, 178 Ill. 2d 92, 101 (1997) (defendant failed to establish entitlement to a fitness hearing).

A recent appellate decision used the version of section 104—21 in existence at the time of trial or sentencing. *People v. Miller*, 291 Ill. App. 3d 320 (1997). The *Miller* decision, however, does not indicate that the issue of the application of the amendment was raised.

While we recognize that the supreme court has not decided this issue, we find the discussion in *Nitz* instructive and persuasive in its characterization of section 104—21 as procedural in nature. *Nitz*, 173 Ill. 2d at 162. Since procedural amendments are subject to retrospective application for pending matters, we will apply the amended version of section 104—21 to the present appeal.

Defendant's three-day trial was held on September 5, 6 and 7, 1995. The next day (September 8, 1995), defendant authorized the release of information from the Illinois State Psychiatric Institute for the purpose of his presentence investigation report. On October 19, 1995, the presentence report was filed and a behavioral clinical examination was ordered. Dr. Dawna Gutzman examined defendant on the same day (October 19) and stated in her report that "defendant demonstrated an understanding of the nature and purpose of the

proceedings against him, and was knowledgeable regarding the roles of various courtroom personnel. Furthermore, he demonstrated a capacity to assist counsel with regard to aggravating and mitigating factors." The report further indicated that defendant had a prescription for 300 milligrams of lithium carbonate to be taken three times a day as a mood stabilizer. On November 2, 1995, a fitness hearing was held and the sole witness was Dr. Gutzman. The trial court found defendant fit for sentencing. The record does not indicate that the type or dosage of the medication prescribed for defendant at the time Dr. Gutzman examined was any different at the time of trial.

Under the facts of this case, we find that defendant failed to overcome the presumption that he was fit to stand trial solely by virtue of the receipt of medication.

■ Next, defendant challenges his sentence on three grounds: (1) the natural life sentence should be vacated because the jury returned a general verdict convicting defendant of first degree murder without determining whether defendant was guilty as the actual shooter or under the principles of accountability; (2) the sentence is excessive; and (3) the trial court considered improper factors.

Defendant has waived review of any sentencing issue by his failure to file a written motion to challenge the sentence as required by statute. 730 ILCS 5/5—8—1(c) (West 1994) (Pub. Act 88—311, § 15, eff. August 11, 1993). In the present case, defendant was sentenced on November 2, 1995, *i.e.*, after the effective date of the amendment. Defendant did not file a postsentencing motion. Under the amendment, failure to file a written postsentencing motion challenging the correctness of a sentence waives review of the sentence for purposes of appeal. *E.g., People v. Reed*, 282 Ill. App. 3d 278, 281 (1996), *appeal allowed*, 168 Ill. 2d 616 (1996); *People v. McCleary*, 278 Ill. App. 3d 498 (1996); *People v. Moncrief*, 276 Ill. App. 3d 533 (1995).

■ Finally, the State contends that this court should remand the case for sentencing on the two armed robbery convictions. We agree.

The sentencing order imposed a term of natural life without parole for murder but did not enter sentences for the two armed robbery counts. The cause, therefore, must be remanded for the imposition of sentences on those convictions. *People v. Dixon*, 91 Ill. 2d 346, 353-54 (1982); *People v. Frantz*, 150 Ill. App. 3d 296, 300 (1986); see also *People v. Daniel*, 238 Ill. App. 3d 19, 35-36 (1992) (murder and armed robbery can be separate offenses for which separate sentences can be imposed).

For the foregoing reasons, we affirm defendant's convictions and

remand the cause to the trial court for sentencing on the two armed robbery counts.

Affirmed and remanded.

THEIS, J., concurs.

JUSTICE ZWICK, dissenting:
I dissent and would order a new trial based upon the trial court's refusal to answer the question posed by the jury during deliberations.

The Illinois Supreme Court has spoken recently and decisively on this issue and held that jury deliberations are governed by "several fundamental principles," chief among them being the precept that "a jury is entitled to have its explicit legal questions answered." See *Childs*, 159 Ill. 2d at 233.

In *Childs*, the jury posed a question during deliberations which was virtually identical to that posed in the instant case. The trial court refused to answer the question, instructing the jury to continue deliberating. In reversing the defendant's conviction, the supreme court reiterated the general rule that the trial court has a duty to provide guidance where the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion, even where the jury was properly instructed originally. *Childs*, 159 Ill. 2d at 228-29. The court further held that when a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy, and the failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error. *Childs*, 159 Ill. 2d at 229 (and cases cited therein).

The supreme court recognized that a trial court may exercise its discretion and properly decline to answer a jury's inquiries where the original instructions were readily understandable and where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involved a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another. See *Childs*, 159 Ill. 2d at 228. However, none of these circumstances were presented in the case at bar.

Here, as in *Childs*, the jury posed an explicit question which manifested juror confusion on an "intricate" and "difficult" point of law, which other cases have suggested is not an uncommon source of juror confusion. *Childs*, 159 Ill. 2d at 234. The trial court had the obligation to dispel the jury's confusion with a clear and specific

720

answer. See *Childs*, 159 Ill. 2d at 232. Just as the trial court did in *Childs*, the trial judge here simply ordered the jury to continue deliberating. It was the responsibility and obligation of the court to answer these types of questions, and the trial court erred by inaction. The trial court's refusal to answer the question violated the supreme court's clear and unequivocal mandate that jurors must have this type of inquiry answered. *Childs*, 159 Ill. 2d at 228.

Therefore, I would reverse the defendant's conviction and order a new trial.