THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PEDRO VARGAS, Defendant-Appellant.

Fifth District   No. 5—90—0360

Opinion filed February 11, 1992.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate De-
fender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Kenneth R. Boyle,
Stephen E. Norris, and Diane L. Campbell, all of State's Attorneys Appel-
late Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Pedro Vargas, was charged with first-degree murder, attempted first-degree murder, aggravated battery, and armed violence. On February 16, 1990, the defendant was found guilty by a jury of first-degree murder and reckless conduct. He was acquitted on charges of attempted first-degree murder, aggravated battery, and armed violence. On May 8, 1990, the defendant was sentenced to 30 years' imprisonment for first-degree murder.

The defendant alleges that the trial court erred in refusing to instruct the jury on second-degree murder and in refusing to give an involuntary-intoxication instruction. The defendant also claims his sentence is excessive. We affirm.

A jury trial was held February 13 to 16, 1990, and the following evidence was produced. The defendant entered the VFW post in East St. Louis, St. Clair County, Illinois, on June 30, 1989, sometime after 10 a.m. Already at the post were Curtis Manning, Cecil Bell, Carl C. Moore and the defendant's girlfriend, Linda Jones, who tended bar there. Manning testified that when the defendant arrived he exchanged words with Cecil Bell and became upset. The defendant then sat down at the bar and began drinking three to four half-pints of Hennessey cognac. The defendant at some point called Linda Jones to the end of the bar, spoke with her, and shot her several times. Manning stated that the defendant then approached him and began shooting at him at which point he ran outside, where he discovered he had been shot. Manning was later taken to the hospital. He testified that he had not seen any arguing, fighting or slapping between the defendant and Linda Jones.

Cecil Bell added that after he heard the shots he looked up to see the defendant holding a gun and the victim sliding down the wall behind the bar. The defendant then approached Manning and said, "[Y]ou go too, black mother fucker," and shot at him. Defendant then turned toward Bell and said, "I got one for you too, hairy face," and fired but missed him as Bell fled.

Carl Moore also testified at the trial and said that he heard the defendant say to the victim after he shot her that he had loved her and she had "messed up with him." He then saw the defendant light a cigarette. Moore described the defendant's drinking that day as "a little unusual" in that he drank four or five half-pints in a period of around 40 minutes. He also testified that he had not heard any arguing or fighting prior to the shooting of Miss Jones.

Sarah Johnson, who worked as a cook at the VFW post, testified that she observed the defendant shoot Linda Jones three or four times.

She stated that the defendant told her, "I am not going to harm you, you haven't did [*sic*] anything to me." She then saw the defendant walk outside the bar and hand over the gun to the police.

Bobbie Hayes also witnessed the shooting, and he testified that after shooting at Manning and Bell the defendant walked out the rear door of the bar, then quickly returned and fired more shots at no one in particular. As the defendant exited the rear entrance of the post a second time, Hayes heard him say, "Yeah, I know, I go to jail."

Mr. Lee Johnson testified that he had observed the defendant and Cecil Bell arguing prior to the shooting. He described the defendant's manner as "highly agitated." After drinking two or three half-pints of Hennessey, the defendant walked out the door. Shortly thereafter the defendant returned and ordered another half-pint. A few minutes later, according to Mr. Johnson, the shooting began. At some later point, the defendant told Johnson that he knew what he was doing and to call the police. Johnson also testified that there had been rumors that Linda Jones had been having a relationship with someone else while the defendant had been in New York.

East St. Louis police detective Clifton Maston testified that when he arrived at the scene the defendant ran up to him saying, "I killed the bitch, I killed the bitch and I turn myself over to you." Officer Maston then took the gun from the defendant and placed him in the squad car.

At trial the defendant testified, with the help of an interpreter, that he was originally from the Dominican Republic and had resided in the United States since 1972. He first met Jones in 1982 and began dating her in 1987. Six months later they began living together. In the month prior to the shooting, the defendant had gone to New York seeking employment, failed in his efforts, and returned to the area on May 28, 1989. The defendant stated that on June 30, 1989, the day of the shooting, he had been working on the plumbing at Linda Jones' residence. The piping she had bought was the wrong size, and the defendant went to the post to ask where she had bought it. When he entered, the defendant said the people there were laughing at him. The defendant told Cecil Bell not to bother him, and Bell made a comment which the defendant took to mean that Linda Jones had been seeing other men while he was in New York. The defendant said he questioned Jones about this and began drinking. After a third half-pint he went outside. The defendant testified that he went to Jones' car and got a revolver to defend himself against Bell. Upon the defendant reentering the bar, Bell continued to talk about Jones going out with other men. The defendant said that he finished another half-pint and began to feel dizzy. After that, he stated, he remembered nothing until the police awoke him the

next day. The defendant also claimed the police had beaten him and forced him to sign a piece of paper.

Detective Muckensturm testified that she interviewed the defendant on July 1, 1989. When the defendant first came into her office, he told the officer that he knew what he had done and was ready to pay for it. The defendant made a statement which she typed and he signed. Officer Muckensturm read this statement into the record. The statement told substantially the same story as the defendant's testimony, except that the defendant stated that he had driven back to Linda Jones' house to retrieve the gun and a box of shells. The statement also related that at some point the defendant called Jones to the end of the bar and started shooting. The defendant saw the victim fall to the floor, turned and shot at Curtis Manning. He then went outside, gave the gun to the police and was placed under arrest.

Dr. Daniel Cuneo, a psychologist with the Illinois Department of Mental Health, testified on behalf of the defendant. He described the defendant as a person with a long-term history of alcohol abuse. Defendant apparently consumed three to four half-pints of cognac and 10 to 20 beers a day. The doctor believed the defendant had developed a high tolerance for alcohol. Dr. Cuneo had interviewed the defendant three times prior to trial and had been told basically the same story each time. The defendant did, however, tell Cuneo that he thought someone might have put something in his drink and that after finishing his drink he remembered nothing. Dr. Cuneo was of the opinion that the defendant would not qualify for the intoxication defense because he knew right from wrong and had the ability to conform his behavior to the law even though he may have been somewhat impaired by the alcohol.

The defendant contends that the circuit court improperly rejected the defendant's tendered instructions on second-degree murder and thereby denied the defendant a fair jury determination of his relative culpability.

The instructions, Illinois Pattern Jury Instructions, Criminal, Nos. 7.03A and 7.04A (2d ed. Supp. 1989), tendered by the defendant are based upon section 9—2(a)(1) of the Criminal Code of 1961, which states:

"A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***." Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1).

For a defendant to be entitled to an instruction on second-degree murder in a murder case there must be some evidence in the rec-

ord which, if believed by a jury, would reduce the crime to second-degree murder. (*People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378.) While the evidence may arguably suggest that the defendant was acting under a sudden and intense passion resulting from serious provocation, there is no indication whatsoever that the victim was the source of the alleged provocation. The record is utterly devoid of even the slightest evidence manifesting any sign of provocation on the part of the individual killed, Linda Jones. Thus the minimum standard of *Lockett* was not met, and the trial court did not commit error in refusing the instruction for second-degree murder.

■ The defendant also alleges that the circuit court improperly rejected the defendant's tendered instruction on involuntary intoxication thereby denying him a fair trial.

The relevant statute concerning involuntary intoxication states:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:
>
> ***
>
> (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ill. Rev. Stat. 1989, ch. 38, par. 6—3(b).

The only evidence in the record suggesting that the defendant might have been involuntarily intoxicated was an isolated statement he made to Dr. Cuneo during a pretrial interview where he mentioned that someone might have put something in his drink and the defendant's testimony at trial that after his fourth half-pint of cognac he began to feel dizzy after which he remembered nothing until the next day.

*People v. White* (1970), 131 Ill. App. 2d 652, 264 N.E.2d 228, is a factually similar case. In *White* the defendant was away from his glass of beer for a short time, alleged that he later "blacked out" and remembered nothing of the crime, claimed that he requested a blood test for drugs the next day after his arrest, and stated, "I feel I had been drugged." The court did not find sufficient evidence to justify an involuntary-intoxication instruction.

The defendant proposes that his high tolerance for alcohol would have prevented him from being intoxicated from the alcohol alone, thus indicating he might have been drugged. We find this unconvincing. The record shows that the defendant consumed up to four half-pints of cognac in a period of 30 to 40 minutes as well as at least one beer just before that. The record also shows that the defendant remembered explicit factual details of the event one day later though at trial he claimed not to remember. There were numerous witnesses to the defendant's

excessive consumption of alcohol, his relative composure, his awareness of his actions, and their consequences at the time of the shooting, yet no evidence from anyone other than the defendant that his behavior resulted from anything other than his own passions spurred on by the intake of alcohol.

Since the record does not disclose a particular set of facts which would justify the involuntary-intoxication instruction, there was no error in its refusal. (*People v. White*, 131 Ill. App. 2d 652, 264 N.E.2d 228.) It should be noted the trial court did give an instruction on voluntary intoxication.

■ Finally, the defendant claims that his sentence of 30 years' imprisonment is excessive and should be reduced because of the defendant's rehabilitative potential, his insignificant criminal record and the fact that this offense resulted from overconsumption of alcohol and other factors unlikely to recur.

The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) We first note that the defendant did have a prior record, however insignificant, which included a 1974 felony and a 1975 misdemeanor of resisting arrest, which were legitimate aggravating factors in sentencing. The court did take into consideration the influence of alcohol on the defendant as a mitigating factor, as well as the fact that some time had elapsed since the defendant's previous criminal convictions. The maximum penalty available was 60 years' imprisonment, the State asked for 35 years' imprisonment, and the defendant received a sentence of 30 years' imprisonment. We find no abuse of discretion in sentencing on the part of the trial court under the circumstances of this case.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GOLDENHERSH, P.J., and LEWIS, J., concur.