THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMON DELGADO, Defendant-Appellant.

First District (4th Division)   No. 1—92—3971

Opinion filed June 28, 1996.

852

Pamela O'Shea, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Sang Won Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a jury trial, defendant, Ramon Delgado, was found guilty of two counts of first-degree murder and sentenced to natural life in prison. On appeal, defendant contends the trial court erred by (1) refusing his tendered instruction on second-degree murder based on provocation; and (2) allowing a pathologist to testify to the amount of cocaine found in the victims' bodies. We affirm.

At trial, Rhonda Tolden testified that at approximately 10 p.m. on January 12, 1989, she was in her apartment with her mother, Joyce Tolden, and a friend, Orlando Valentin. Defendant came by and stated he wanted to get "high," so Rhonda, Joyce, and defendant walked back to the kitchen, where they introduced defendant to Orlando. Defendant took out the cocaine he had brought with him, and the four of them smoked it.

Rhonda and Joyce then left the kitchen, but they soon heard noises coming from there. Rhonda and Joyce reentered the kitchen, where they saw defendant going through drawers and looking in the trash. Orlando was sitting in the kitchen, watching defendant.

Joyce asked defendant what he was doing and told him to go home, but defendant did not respond. Rhonda then called the police and told them someone was in her home who refused to leave. Meanwhile, defendant had walked partially into a bedroom and continued to look through "things." Orlando continued to watch defendant.

When the police arrived, Rhonda went down the front stairs to meet them. Defendant followed her down the stairs, and Rhonda pointed defendant out as the person who had refused to leave her apartment. Rhonda then went back up the stairs to her apartment and closed the door. She looked out a window and saw the police briefly talk to defendant before they allowed him to walk away.

About 15 or 20 minutes later, Rhonda heard the sound of pebbles being thrown at her window. When Rhonda went to the window, she saw defendant standing outside. Rhonda opened the window, and defendant told her he wanted to apologize for the way he had acted toward Joyce. Rhonda and Joyce let defendant into the hallway outside her apartment, and defendant apologized to Joyce and said he wanted to make it up to them by getting some more cocaine from his house.

Rhonda and Joyce gave defendant a ride to his house. Defendant went inside and came out about 10 minutes later. Defendant said he "got it," so they drove back to Rhonda's apartment. When they entered the apartment, Rhonda immediately walked into the bathroom. As she was using the bathroom, Rhonda heard a loud banging noise and then another loud noise that sounded like something hitting a wall. She heard Joyce yelling "call the police, Rhonda, call the police."

Rhonda ran out the bathroom toward the kitchen, where she saw defendant holding Orlando against the refrigerator and stabbing him in the chest. Orlando was trying to get away, but all he could do was "flail with [his] arm." Orlando had nothing in either of his hands.

Rhonda ran out of the apartment and went upstairs to the third-floor apartment, where she banged on the door and screamed for help. Rhonda was allowed inside the apartment, where she called the police. When the police arrived, Rhonda led them to the back of her apartment, where she saw Orlando lying dead on the floor partially in the doorway of the bedroom and kitchen. She then led the police into the kitchen, where she saw Joyce "curled up" dead in the corner by the back door.

Rhonda made a statement to the police, describing defendant as a 6-foot 2-inch, 280-pound Hispanic man with an Afro who walked with a limp. Officer Richard Holub testified that at about 4:15 a.m. on January 13 he and his partner arrested defendant near 2700 North Kimball Street. Rhonda testified that around 5 a.m. on January 13 police officers took her to a room in the police station, where she identified defendant as the offender.

Detective Lawrence Holec testified he met with defendant in an interview room at the police station shortly after his arrest. Defendant told Holec that at about 10:30 p.m. on January 12, 1989, he went to Rhonda's apartment, where he met Rhonda, Joyce, and Orlando. The four of them free-based cocaine. However, defendant began to argue with Joyce, Rhonda, and Orlando because he believed they were stealing some of his cocaine and hiding it in the apartment. He refused to leave and instead began to look for the cocaine.

Detective Holec further testified that Rhonda threatened defendant with a knife and told him she would call the police if he did not leave; however, defendant remained in the apartment. When the police did arrive, defendant "left voluntarily and waited down the street until the police left." Defendant then returned to Rhonda's apartment, apologized, and told them that if they went back to his house he could get some more cocaine.

Rhonda and Joyce drove defendant back to his house, where he took a kitchen knife and put it underneath his jacket. Defendant returned to the car, and they drove back to Rhonda's apartment. Once inside the apartment, defendant and Joyce began talking in the living room. When Joyce got up to walk to the kitchen, defendant took the knife from his coat and stabbed her in the back. As Joyce ran toward the kitchen, she yelled "Call the police."

Orlando came out of the kitchen, and defendant stabbed him once, causing him to fall to the floor. Orlando started to get up, so defendant stabbed him again. Defendant then went back to Joyce, who was in the kitchen, and stabbed her again. Defendant fled the apartment, disposed of the knife, and shortly thereafter was arrested.

Assistant State's Attorney Marguerite Quinn testified she also spoke with defendant on the morning of January 13, 1989. Quinn testified defendant made a statement about the homicide substantially similar to the statement he made to Detective Holec.

Defendant testified that on January 12, 1989, he got some cocaine from his brother and went to Rhonda's apartment. Once inside the apartment, defendant, Rhonda, Joyce, and Orlando went to the kitchen, and Joyce prepared one-half of the cocaine so that it could be smoked. Each of them had four "hits" from the pipe, which caused them to be "extremely high."

Joyce began to prepare the rest of the cocaine. Defendant took two hits, then went to the bathroom for approximately one minute. When defendant returned to the kitchen, the rest of the cocaine was gone, and Joyce, Rhonda, and Orlando told him they had smoked it. Defendant did not believe they could smoke all the cocaine in such a short period of time, and he accused them of stealing it.

Defendant began looking for the cocaine in the kitchen drawers. Joyce and Rhonda denied stealing the cocaine, and they asked him to leave. Defendant continued to look for the cocaine, and Rhonda grabbed a knife, pointed it at his chest, and told him to leave. Defendant walked away from her, and Rhonda left the kitchen and called the police. When the police arrived, defendant walked out of the apartment and told the officers that he was leaving. One of the officers patted him for drugs, found none, and let him go.

Defendant testified he walked down the block and ran into an old acquaintance. They walked back to the building next to where Rhonda lived, where they smoked a joint of mint leaf. After smoking the joint, defendant heard someone knocking on Rhonda's window. Defendant saw Orlando at the window, and Orlando asked him if he was all right. Defendant signalled that he wanted to speak to Rhonda or Joyce, and Orlando came down, opened the door, and let him into the apartment.

Defendant went to the kitchen, where he apologized to Joyce and told her if she gave him a ride home he could get more cocaine from his brother. Joyce and Rhonda drove defendant back to his house, and defendant got out, walked into the garage and saw that his brother's car was not there. Defendant walked back and told Joyce and Rhonda to drive him to a nearby bar. At the bar, defendant got cocaine from a man named Pedro, and then defendant, Joyce, and Rhonda drove back to Rhonda's apartment.

Joyce walked into the kitchen, and defendant soon followed her. When he entered the kitchen, defendant smelled the aroma of cocaine. Defendant saw Orlando sitting on a chair in the kitchen, and defendant asked him what he was doing. Orlando had a "slight smirk" on his face, but he said nothing to defendant.

Defendant accused Orlando of being a thief and smoking the cocaine defendant had brought earlier. Joyce told defendant to stop acting stupid and to bring out the cocaine he had gotten in the bar. Defendant told Joyce he would not hand over the cocaine until Orlando produced the cocaine he had taken from defendant earlier. Defendant again called Orlando a thief.

Orlando then became angry, picked up a knife from the counter, and began to approach defendant. Orlando told defendant he was go-

ing to kill him. Defendant told Orlando not "to play like that." Defendant pushed Orlando back. Orlando again came at defendant but then fell against the counter. When Orlando came at defendant for a third time, defendant grabbed Orlando and threw him against the refrigerator.

Defendant and Orlando began to struggle, and they fell on the floor. Joyce began hitting defendant in the back and leg. Orlando dropped the knife and defendant grabbed it. Defendant tried to get up from the floor, but Orlando was holding onto him, so defendant stabbed him in the chest. They continued to struggle, and defendant swung the knife back to get Joyce to stop hitting him. Orlando would not get off of defendant, so defendant stabbed him "twice or maybe more." Orlando then fell onto the floor.

Defendant turned around and saw Joyce heading toward a knife rack, so he stabbed her in the back. Joyce swung around quickly, and defendant stabbed her in the chest area because he thought she might have a knife in her hands. Defendant could not recall how many times he stabbed Joyce; he "just kept stabbing her." Defendant then saw all the blood, felt as if he was "in shock," and ran out of the apartment. He was arrested a couple of hours later.

Defendant testified he told Detective Holec at the police station that he had stabbed two people to death after being threatened by them. However, Detective Holec did not believe defendant. Holec threatened defendant that he would never see his family again unless he cooperated, and Holec told him that if he changed his story he would get help for his drug problem. Defendant agreed to go along with Holec's story and tell Assistant State's Attorney Quinn that defendant brought the knife to Rhonda's apartment and stabbed Joyce in the back and then stabbed Orlando as he came out of the kitchen.

Doctor Eupil Choi, a forensic pathologist for the Cook County medical examiner's office, testified he performed the autopsies on Joyce and Orlando on January 13, 1989, and determined they both died from multiple stab wounds. Doctor Choi also stated he had reviewed the toxicological reports completed on March 15, which indicated that Joyce had 1.13 micrograms per milliliter of cocaine in her blood and Orlando had .07 micrograms per milliliter of cocaine in his blood. Over defense counsel's objections, Doctor Choi was permitted to testify that these were small amounts of cocaine.

At the jury instruction conference, defendant tendered instructions on second-degree murder based on provocation. The trial court refused to give those instructions, although it did give an instruction on second-degree murder based on the unreasonable belief of self-defense. The jury subsequently found defendant guilty of two counts of first-degree murder. Defendant filed this timely appeal.

First, defendant argues the trial court erred when it denied his tendered instructions on second-degree murder based on provocation. Defendant was entitled to those instructions if "some evidence" of serious provocation existed in the record which, if believed by the jury, would reduce the crime to second-degree murder. *People v. Vargas*, 224 Ill. App. 3d 832, 835-36 (1992).

The second-degree murder statute provides in relevant part:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and ***

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***

***

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9—2 (West 1992).

Mutual combat is one of the recognized forms of serious provocation sufficient to reduce first-degree murder to second-degree murder. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). Defendant contends his trial testimony indicated mutual combat took place immediately prior to the stabbings and, therefore, the trial court should have given the provocation instruction.[1]

Defendant's trial testimony indicated that he stabbed Orlando after Orlando picked up a knife and threatened to kill him, and he stabbed Joyce because he thought she was reaching for the knife rack and might have a knife in her hands. Thus, according to defendant's testimony, his stabbings of Orlando and Joyce were defensive in nature. Accordingly, we must determine whether the term "mutual combat" encompasses a struggle in which defendant attempts to defend himself from an assault.

In *People v. Matthews*, 21 Ill. App. 3d 249, 253 (1974), we adopted the Corpus Juris Secundum definition of "mutual combat": "one into which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms." *Matthews*, 21 Ill. App. 3d at 253, citing 15 C.J.S. *Combat*, at 358 (1967). Although not cited by *Matthews*, the next sentence of the Corpus Juris Secundum definition of "mutual combat" states, "[t]he term implies a common intent to fight, but not necessarily an

---

[1]At oral argument, defendant claimed he was also entitled to a provocation instruction based on "substantial physical injury or assault," one of the other recognized forms of serious provocation sufficient to reduce first-degree murder to second-degree murder. *People v. Tenner*, 157 Ill. 2d 341, 371 (1993). Defendant waived this issue by failing to raise it in his appellant's brief. 145 Ill. 2d R. 341(e)(7).

exchange of blows" (15 C.J.S. *Combat*, at 358 (1967)) and then it directs the reader's attention to a passage (now 40 C.J.S. *Homicide* § 83 (1991)) discussing when mutual combat reduces homicide to second-degree murder. That passage states that "[t]o constitute a mutual combat *** the persons must have had a mutual intent to fight" (40 C.J.S. *Homicide* § 83, at 465 (1991)), and it cites in support a Georgia case, *Colvin v. State*, 155 Ga. App. 736, 272 S.E.2d 516 (1980). The court in *Colvin* held "for true mutual combat, which would reduce the act from murder to [second-degree murder], to exist, it must appear that there was a readiness and intention on the part of both parties to engage in immediate conflict with each other. 'Fighting to repel an unprovoked attack is self-defense and is authorized by the law, and should not be confused with mutual combat.' " *Colvin*, 155 Ga. App. at 738, 272 S.E.2d at 519, quoting *Odom v. State*, 245 Ga. 60, 62, 126 S.E.2d 472, 472 (1962).

In *People v. Lewis*, 229 Ill. App. 3d 874 (1992), we held, as in *Colvin*, that mutual combat does not constitute a fight in which one of the parties acts in self-defense. Lewis was charged with the first-degree murder of her boyfriend of four months, Jones. Lewis testified at trial that she carried a knife for protection from Jones because she was afraid of him when he was intoxicated. *Lewis*, 229 Ill. App. 3d at 878. On the evening of August 9, 1989, Jones became intoxicated and started arguing and slapping Lewis. *Lewis*, 229 Ill. App. 3d at 878. Jones started to choke Lewis, and she stabbed him. *Lewis*, 229 Ill. App. 3d at 878. Lewis stated she did not mean to kill Jones, but that she was scared and " 'just trying to get him off [her] because he was choking [her] very hard.' " *Lewis*, 229 Ill. App. 3d at 879. The trial court gave instructions on second-degree murder based on an unreasonable belief in the need for self-defense, but refused to give instructions on second-degree murder based on sudden and intense passion resulting from serious provocation. *Lewis*, 229 Ill. App. 3d at 879. The jury found Lewis guilty of first-degree murder.

On appeal, Lewis argued the trial court should have given the "provocation" instruction because there was evidence of mutual combat in the record. The appellate court disagreed, finding no evidence in the record that Lewis willingly participated in the struggle. *Lewis*, 229 Ill. App. 3d at 881. Instead, her actions were motivated by fear of Jones and were defensive in nature. *Lewis*, 229 Ill. App. 3d at 881. The court held "[t]o warrant a 'provocation' instruction based upon mutual combat, the struggle must be *mutual*. Struggling with an attacker in an effort to ward off or defend one's self against an assault is not sufficient to warrant a provocation instruction." (Emphasis in original.) *Lewis*, 229 Ill. App. 3d at 881.

Defendant never mentions *Lewis* or attempts to distinguish it, but he does cite a number of cases in support of his argument that evidence he killed Orlando and Joyce in self-defense merited a provocation instruction. One of those cases, *People v. March*, 95 Ill. App. 3d 46 (1981), is inapposite. There, the appellate court held the trial court should have given the provocation instruction because defendant and victim engaged in a fistfight, they were both armed, they both shot each other, and conflicting evidence existed as to who drew and fired first.

Defendant also cites *People v. Phillips*, 159 Ill. App. 3d 142 (1987), and *People v. Parker*, 260 Ill. App. 3d 942 (1994), in which the appellate court held that evidence that defendants killed their attackers while defending themselves from an assault was sufficient to require the provocation instruction based on mutual combat. *Phillips* was written before *Lewis*, while *Parker* did not cite *Lewis* in its analysis of the issue. Further, neither *Phillips* nor *Parker* explained how a fight between two individuals, one of whom does not wish to fight and acts only in self-defense, can be considered "mutual," a term that connotes a shared or common desire. See Roget's 21st Century Thesaurus 565 (1992).

We find the *Lewis* analysis of the mutual combat issue compelling, and we decline to follow *Phillips* and *Parker* to the extent their analysis of the issue differs. The term "mutual combat" connotes a willingness by both parties to engage in a fight. Accordingly, defendant was not entitled to a mutual combat instruction based on his testimony that he found himself the unwilling participant in a fight and acted only to defend himself from attack.

Nor was defendant entitled to a mutual combat instruction based on the version of the stabbings as testified to by Detective Holec and Assistant State's Attorney Quinn. According to their testimony, defendant admitted he brought the knife to Rhonda's apartment following an argument about whether Joyce, Rhonda, and Orlando had stolen some of defendant's cocaine. Once inside the apartment, defendant stabbed Joyce in the back and, when Orlando came out of the kitchen, defendant stabbed him in the chest.

Under this version of the stabbings, defendant (not Orlando) instigated the combat following an earlier argument about whether Joyce, Rhonda, and Orlando had stolen his cocaine. However, one who instigates combat cannot rely on the victims' response as evidence of mutual combat sufficient to mitigate the killing of the victims from first-degree murder to second-degree murder. *People v. Austin*, 133 Ill. 2d 118, 126 (1989). Accordingly, the trial court did not abuse its discretion by refusing to give defendant's provocation instruction based on mutual combat.

■ Next, we address defendant's argument that the trial court erred by allowing Doctor Eupil Choi, a forensic pathologist, to testify that based on his review of the toxicological reports, Joyce and Orlando had small amounts of cocaine in their bodies. Defendant contends Doctor Choi was not an expert in the field of toxicology and therefore was not qualified to render such an opinion.

In order to testify as an expert, one must possess experience and qualifications affording him knowledge that is not common to lay persons and that will assist the trier of fact in reaching its conclusions. *People v. Novak*, 163 Ill. 2d 93, 104 (1994). The determination of whether the witness qualifies as an expert is within the sound discretion of the trial court. *Novak*, 163 Ill. 2d at 104.

The trial court determined Doctor Choi, "in his capacity both as forensic pathologist and medical doctor," had the expertise to testify as to the amount of cocaine in the victims' bodies. We find no abuse of discretion.

■ Defendant also argues Doctor Choi did not rely on the toxicological reports when making his findings about the victims' cause of death and, therefore, his testimony about those reports was hearsay. We disagree. An expert may reveal the contents of materials upon which he reasonably relied in order to explain the basis of his opinion. *People v. Anderson*, 113 Ill. 2d 1, 9 (1986). Doctor Choi testified he performed the autopsies on Joyce and Orlando on January 13, 1989, and he later reviewed the March 15 toxicological reports as part of his findings. Accordingly, we find no hearsay violation here.

For the foregoing reasons, we affirm the trial court. As part of our judgment, we grant the State's request and assess defendant $150 as costs for this appeal.

Affirmed.

HOFFMAN, P.J., and CAHILL, J., concur.