THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM FLORES, Defendant-Appellant.

First District (4th Division)    No. 1—93—0362

Opinion filed August 1, 1996.

Thomas Peters, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jean T. Quinn, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a jury trial, defendant, William Flores, was found guilty of first-degree murder and sentenced to 50 years in prison. On appeal, defendant contends: (1) the trial court erred by failing to instruct the jury as to the defense of justifiable use of force to prevent

a forcible felony; (2) the trial court erred by refusing his tendered instruction on second-degree murder based on provocation; (3) his trial counsel rendered ineffective assistance; and (4) the trial court abused its discretion by sentencing him to 50 years in prison. We affirm.

At trial, Jose Conde testified that sometime in October or November 1989, defendant walked into the store where Conde worked, ordered a sandwich, and asked to use the telephone. Conde told defendant he could not use the telephone, and defendant said "forget about the sandwich" and left.

Conde testified that at about 8 p.m. on December 8, 1989, he was standing on the northeast corner of Montrose and Hamlin when he saw defendant come out of a beauty shop located across Hamlin. Defendant walked up to Conde, cursed him, and punched him in the chin and chest. Defendant then pulled out a knife and said he was going to kill Conde. Conde took a step back, and Billy Howard came over and pushed defendant away in order to separate them. Billy did not have a knife or anything else in his hands.

Conde testified he saw defendant stab Billy three or four times. While defendant was stabbing Billy, Conde ran into a store and told a woman to call the police. Conde grabbed a knife from the store and ran back outside, where he saw defendant stabbing Billy in the neck. When defendant saw Conde had a knife, defendant told Conde he had a gun and would kill him.

The police arrived and told Conde to put the knife down. Conde told the police that defendant had killed someone, and the police arrested defendant.

Lourdes Cepero testified she was the owner of the beauty shop defendant walked into around 7:30 or 8 p.m. on December 8, 1989. Defendant asked to make an appointment, then "yelled out for someone" and ran out of the store. She looked out a window and saw defendant arguing with Conde, who was unarmed. She saw defendant punch Conde in the chin, after which defendant "pulled out something," but she could not see what it was.

Cepero testified she saw Billy Howard try to separate defendant and Conde. She observed defendant hold Billy's shoulder while making a pumping motion with his right hand. Conde ran into a store and came out with a "big knife." Conde began to chase defendant and she could hear defendant say he was going to shoot Conde. The police arrived and arrested defendant.

Edward Abbas testified that on December 8, 1989, he owned a store on the corner of Hamlin and Montrose. Around 8 p.m. that evening, he saw Conde and another man (hereinafter second man) fight-

ing outside his store. A third man came between Conde and the second man, and the second man stabbed the third man, who was unarmed. Abbas testified he never saw the third man punch Conde or the second man.

Officer Nancy Hartigan testified that at approximately 8 p.m. on December 8, 1989, she and her partner observed defendant and Conde at the intersection of Montrose and Hamlin. Defendant was standing by a vehicle on the southwest corner of Montrose, and Conde was standing on the northwest corner with a knife in his hand.

Officer Hartigan testified she ordered Conde to put down the knife, which he did. Conde then rushed up to her and repeatedly stated that defendant had stabbed someone. Officer Hartigan's partner conducted a pat-down search of defendant and found a knife covered with blood.

Officer Hartigan stated she walked to the northeast corner of Montrose and Hamlin, where she saw pools of blood on the sidewalk. She found no weapons near the pools of blood, nor did she see a body. After sending a flash message of a possible stabbing victim, Officer Hartigan arrested defendant for battery against Conde and drove him to the 17th District police station. Defendant was not bleeding and she observed no open cuts or lacerations on him. On the way to the police station, defendant never complained of suffering any injuries.

Officer James Valenzano testified that at approximately 8 p.m. on December 8, 1989, he received two radio calls, one looking for an aggravated battery victim at Hamlin and Montrose, and the other indicating a "man [was] down" at 3756 Agatite, which was one-half block away from Hamlin and Montrose. Officer Valenzano went to 3756 Agatite, where he saw Billy Howard lying face down in a puddle of blood. Officer Valenzano followed the trail of blood that led from where Billy was found to the corner of Montrose and Hamlin. He did not recover a weapon from Billy, nor did he find one along the trail of blood.

Doctor Shaku Teas, a forensic pathologist, testified she performed the autopsy on Billy Howard. The autopsy revealed Billy had been stabbed nine times. Billy died as the result of the multiple stab wounds.

After the State rested, defendant testified that two months prior to December 8, 1989, he went to a store at Montrose and Hamlin, ordered a sandwich, and asked to use the telephone. Conde, who was working at the store, refused to allow defendant to use the telephone. Defendant left without paying for the sandwich.

After leaving work at 7:15 p.m. on December 8, 1989, defendant

stopped at Lourdes' salon to make an appointment for a haircut. When he left the salon, he heard someone on the northeast corner of Hamlin calling his name. Defendant walked over to the northeast corner, where he saw Conde.

Defendant testified Conde cursed him and told him he had to pay for the sandwich he had ordered two months earlier. Defendant told Conde he was not going to pay for the sandwich, and Conde struck him on the left side of the cheek, causing defendant's glasses to fall off. Defendant's vision is "not so good" without the glasses.

Defendant testified that as he and Conde were fighting, Billy Howard came over towards them. Billy punched defendant and reached for a "shiny object," perhaps a knife or ice pick, in his jacket. Fearing for his life, defendant pulled out his own knife and stabbed Billy. Defendant then saw Conde standing nearby with a large knife. Defendant told Conde to leave, and the police came and arrested defendant.

The jury convicted defendant of first-degree murder, and the trial court subsequently sentenced him to 50 years in prison. Defendant filed this timely appeal.

■ First, defendant argues the trial court erred by failing to instruct the jury as to the defense of justifiable use of force to prevent a forcible felony. Defendant waived this issue by failing to tender such an instruction at trial. *People v. Tannenbaum*, 82 Ill. 2d 177, 180 (1980).

Even if the issue had not been waived, we would not reverse the trial court. A defendant is entitled to an instruction on his theory of the case, as long as some evidence of that theory was presented to the jury. *People v. Sims*, 247 Ill. App. 3d 670, 678 (1993). The underlying theory asserted here is justification to prevent a forcible felony. Section 7—1 of the Criminal Code of 1961 states that a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1989, ch. 38, par. 7—1 (now 720 ILCS 5/7—1 (West 1992)). Section 2—8 of the Code, in effect at the time defendant killed Billy Howard, stated that the definition of a forcible felony included aggravated battery. Ill. Rev. Stat. 1989, ch. 38, par. 2—8. A battery is an aggravated battery if the person who committed the battery "[i]s, or the person battered is, on or about a public way, public property or public place of accommodation or amusement." Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(8) (now 720 ILCS 5/12—4(b)(8) (West 1992)).

■ Defendant testified he stabbed Billy near the northeast corner

of Hamlin because Billy punched him and had reached in his jacket for a shiny object, perhaps a knife or ice pick. Defendant contends his testimony provided some evidence that his killing of Billy was reasonably necessary to prevent the forcible felony of battery on a public way and, thus, was justifiable under section 7—1 of the Code. Therefore, since the trial court never gave a forcible felony instruction, we should reverse and remand for a new trial.

The State argues that any error in failing to give the forcible felony instruction was harmless, because the trial judge instructed the jury that a person is justified in the use of deadly force if he reasonably believed such force was necessary to prevent imminent death or great bodily harm to himself.

We agree with the State. Deadly force "is *necessary* to prevent [battery on a public way]" (emphasis added) (Ill. Rev. Stat. 1989, ch. 38, par. 7—1 (now 720 ILCS 5/7—1 (West 1992))) only when defendant reasonably believes he is in danger of death or great bodily harm. To hold otherwise would lead to absurd results. For example, deadly force could then be used against an unwanted pinch on a public way. That the legislature did not intend such a result is demonstrated by amended section 2—8 of the Criminal Code, effective January 1, 1990, which provides that the definition of "forcible felony" includes only those aggravated batteries "resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2—8 (West 1992).

In determining whether it was reasonable for defendant to believe he needed to use deadly force to prevent imminent death or great bodily harm, the jury here necessarily considered the same evidence that would be involved in determining whether defendant reasonably used deadly force to prevent the forcible felony of battery on a public way. Thus, defendant received the jury's informed consideration of his theory of self-defense, and any error in failing to give the forcible felony instruction was harmless.

Defendant contends *People v. Garcia*, 169 Ill. App. 3d 618 (1988), compels a different result. In *Garcia*, the trial court apparently gave an instruction on self-defense based on the imminent danger of death or great bodily harm, but refused to give the forcible felony instruction. *Garcia*, 169 Ill. App. 3d at 620. The jury found Garcia guilty of first-degree murder. The appellate court reversed and remanded for a new trial because some evidence existed in the record that defendant was on a public way when the victim battered defendant and defendant shot the victim. *Garcia*, 169 Ill. App. 3d at 621.

We decline to follow *Garcia*, as it provides no explanation for why deadly force is *necessary* to prevent battery on a public way if defendant is not in danger of death or great bodily harm.

■ Next, we address defendant's argument that the trial court erred when it denied his tendered instructions on second-degree murder based on provocation. The second-degree murder statute provides in relevant part:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and ***

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***

***

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9—2 (West 1992).

■ Mutual combat is a recognized form of serious provocation sufficient to reduce first-degree murder to second-degree murder. *People v. Delgado*, 282 Ill. App. 3d 851 (1996). Defendant testified he stabbed Billy in self-defense after Billy attacked him with his fists and reached for a shiny object in his jacket. Defendant contends such testimony indicated mutual combat took place immediately prior to the stabbing and, therefore, the trial court should have given the provocation instruction.

We faced a similar issue in *Delgado*: "whether the term 'mutual combat' encompasses a struggle in which defendant attempts to defend himself from assault." *Delgado*, 282 Ill. App. 3d at 857. We began our analysis there (*Delgado*, 282 Ill. App. 3d at 857) by citing *People v. Matthews*, 21 Ill. App. 3d 249, 253 (1974), which adopted the Corpus Juris Secundum definition of "mutual combat": "one into which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms." *Matthews*, 21 Ill. App. 3d at 253, citing 15 C.J.S. *Combat*, at 358 (1967). We noted (*Delgado*, 282 Ill. App. 3d at 857-58) how the Corpus Juris Secundum definition also states "[t]he term implies a common intent to fight, but not necessarily an exchange of blows" (15 C.J.S. *Combat*, at 358 (1967)), and directs the reader's attention to what is now 40 C.J.S. *Homicide* § 83 (1991). That section states "[t]o constitute a mutual combat *** the persons must have had a mutual intent to fight" (40 C.J.S. *Homicide* § 83, at 465 (1991)) and cites in support *Colvin v. State*, 155 Ga. App. 736, 272 S.E.2d 516 (1980), which held "[f]ighting to repel an unprovoked attack is self-defense and is authorized by the law, and should not be confused with mutual combat." *Colvin*, 155 Ga. App. at 738, 272 S.E.2d at 519, quoting *Odom v. State*, 245 Ga. 60, 62, 126 S.E.2d 472, 475 (1962).

*Delgado*, 282 Ill. App. 3d at 858, then discussed *People v. Lewis*, 229 Ill. App. 3d 874 (1992). Lewis killed her boyfriend, Jones, and

testified she did so because he was choking her and she was scared. *Lewis*, 229 Ill. App. 3d at 879. *Lewis* held the trial court did not err by denying a provocation instruction based on mutual combat, because Lewis' actions were motivated by fear of Jones and were defensive in nature. *Lewis*, 229 Ill. App. 3d at 881. *Lewis* held "[t]o warrant a 'provocation' instruction based upon mutual combat, the struggle must be *mutual*. Struggling with an attacker in an effort to ward off or defend one's self against an assault is not sufficient to warrant a provocation instruction." (Emphasis in original.) *Lewis*, 229 Ill. App. 3d at 881.

*Delgado*, 282 Ill. App. 3d at 859, noted two cases, *People v. Phillips*, 159 Ill. App. 3d 142 (1987), and *People v. Parker*, 260 Ill. App. 3d 942 (1994), which contradicted *Lewis*. However, *Delgado* found the *Lewis* analysis compelling and held defendant was not entitled to a mutual combat instruction based on his testimony that he found himself the unwilling participant in a fight and acted only in self-defense. *Delgado*, 282 Ill. App. 3d at 859. Similarly, in the present case, defendant Flores was not entitled to a mutual combat instruction based on his testimony that he stabbed Billy in self-defense after Billy attacked him.

Nor was defendant Flores entitled to a mutual combat instruction based on the version of the stabbings as testified to by Conde, Cepero, and Abbas. Under their version of the stabbings, defendant started the fight with Conde and then stabbed Billy when he tried to separate them. However, one who instigates combat cannot rely on his victim's response as evidence of mutual combat sufficient to mitigate the killing from first-degree murder to second-degree murder. *People v. Austin*, 133 Ill. 2d 118, 126 (1989). Therefore, the trial court did not abuse its discretion when it refused to give defendant's provocation instruction based on mutual combat.

■ Next, defendant argues his trial counsel provided ineffective assistance by failing to tender the forcible felony instruction. We find no ineffective assistance of counsel with respect to the failure to tender the forcible felony instruction because, as discussed earlier, defendant was not prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Randle*, 277 Ill. App. 3d 788, 796 (1995).

■ Defendant also argues his trial counsel provided ineffective assistance by failing to request a psychiatric examination for him that would have shown he suffered from emotional problems distorting "his view of the need to use deadly force." Defendant contends such evidence would have supported a claim of unreasonable belief in self-defense and, thus, a second-degree murder conviction.

In support, defendant cites the testimony of Doctor Karimi, who, at the request of defendant's new counsel, examined defendant after trial and testified at a fitness hearing. According to defendant, Doctor Karimi found defendant suffered from a mental disorder characterized by looseness of association, illogical thinking, personal delusions, and auditory hallucinations. Doctor Karimi's testimony is not in the record on appeal, although the trial court alluded to Doctor Karimi during sentencing when the court stated its disbelief that "defendant's psychiatrist *** had the background to make the claims that he made."

We do have in the record on appeal the testimony of Doctor Marcos, an expert in forensic psychiatry, who testified during the fitness hearing that he had examined defendant on April 13, 1992, and June 3, 1992. Doctor Marcos stated that after the April 13 examination, he was unsure whether defendant had a psychotic illness. After the June 3 examination, though, Doctor Marcos concluded defendant was not suffering from a mental illness that would have precluded his competency to stand trial or be sentenced.

Doctor Marcos also testified he had reviewed a psychiatric report on defendant prepared by Doctor Stipes and the results of psychological tests administered by Doctor Fauteck. Doctor Marcos stated Doctor Stipes shared his opinion that defendant was fit for trial and sentencing, and Doctor Fauteck believed defendant was faking symptoms of mental illness.

The record also contains a letter from Doctor Stipes stating that he examined defendant on September 16, 1992, and determined that defendant was fit for trial and sentencing and was legally sane at the time of the offense. The trial court determined defendant was fit for trial and sentencing.

Based on the record before us, we find no support for defendant's claim he suffered emotional problems that would have caused him to believe he had to kill Billy Howard in self-defense. Defense counsel's failure to request a psychiatric examination of defendant was not objectively unreasonable or prejudicial to defendant and, thus, did not constitute ineffective assistance. *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *Randle*, 277 Ill. App. 3d at 796.

■ Finally, we reject defendant's argument the trial court abused its discretion when sentencing him. The trial court read the presentence report and heard the evidence in aggravation and mitigation. The court noted the seriousness of the offense and defendant's prior convictions for battery and aggravated battery, and sentenced him to 50 years in prison. The 50-year term was within the statutory maximum of 60 years' imprisonment for first-degree murder (see Ill.

Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(a) (now 730 ILCS 5/5—8—1(a)(1)(a) (West 1992))) and did not constitute error.

For the foregoing reasons, we affirm the trial court. As part of our judgment, we grant the State's request and assess defendant $150 as costs for this appeal.

Affirmed.

CAHILL and THEIS, JJ., concur.